FILED
United States Court of Appeals
Tenth Circuit

April 3, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MACK WHITTENBURG,

      Plaintiff-Appellee,

v.

WERNER ENTERPRISES INC.;
MARISELA NEFF; JON M.
MORLAN; and DRIVERS
MANAGEMENT LLC,

      Defendants-Appellants.

No. 07-6063, 07-6119

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-05-1395-W)**

---

Michael L. Carr (Steven E. Holden and Jane R. Cowdery, with him on the briefs),
Holden Carr & Skeens, Tulsa, Oklahoma, for Defendants-Appellants.

Broadus A. Spivey, Broadus A. Spivey, P.C., Austin, Texas, and Sam L. Stein,
Whittenburg Whittenburg Stein & Strange, P.C., Cherokee, Oklahoma, for
Plaintiff-Appellee.

---

Before **McCONNELL, EBEL,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Mack Whittenburg was driving his pickup truck on the highway when he collided with a stalled tractor-trailer. Suffering a number of injuries, Mr. Whittenburg brought suit against Werner Enterprises, Inc., the trucking company, as well as Werner's driver management company and the individual tractor-trailer drivers. The jury ultimately returned a verdict assessing the defendants' negligence at 75% and Mr. Whittenburg's damages at $3.2 million. The defendants timely appealed. We are compelled to reverse and remand for a new trial because of pervasive and improper remarks by Mr. Whittenburg's counsel in closing argument to the jury. Counsel spent the bulk of his argument placing before the jury fictitious admissions never uttered by defendants and launching vituperative and unprovoked attacks on defendants and their counsel. Neither line of argument was appropriate. Their volume and volubility, the fact they went unrebuked despite contemporaneous objections, and the apparent influence they had on the jury's verdict, collectively lead us to the reluctant conclusion that, not only were they improper, but a new trial is required.

I

On the morning of December 1, 2003, driver-trainee Marisela Neff was at the helm of the Werner truck while her trainer, Jon Morlan, was dozing in the sleep seat. After realizing she had taken a wrong turn onto Oklahoma Highway 325, Ms. Neff awakened Mr. Morlan who, after consulting a map, advised Ms. Neff to make a U-turn. Part-way through the U-turn the truck got stuck and

- 2 -

remained jammed in the highway, blocking the road in both directions and shining its headlights toward oncoming traffic.

Mr. Morlan exited the truck and attempted to ascertain whether and how it might be moved out of the way of traffic. Meanwhile, Ms. Neff saw headlights approaching and ran into the middle of the highway waving a flashlight. When that failed to slow the oncoming vehicle, she ran back to the truck and began to beep the horn and turn on more lights. Mr. Whittenburg, the driver of the approaching car, testified that as he approached the obstruction he observed only the truck's headlights shining down the opposite side of the road. Believing the lights to emanate from a large vehicle parked on the opposite shoulder, Mr. Whittenburg did not slow down and as a result collided with the truck.

Both sides agree that it was dark at the scene, with little or no ambient light, and that neither Ms. Neff nor Mr. Morlan placed reflective warning markers, available in their truck, on the highway. There was reflective tape on the sides of the Werner truck, though whether Mr. Whittenburg was in a position to see the tape's reflection given the angle of the truck was a matter of dispute; Mr. Whittenburg testified he did not see the reflective tape.

Ultimately, Mr. Whittenburg brought this suit for injuries he suffered as a result of the collision. At the close of trial, Mr. Whittenburg's counsel presented a closing argument in which he asked the jury to "imagine" with him that, shortly after Mr. Whittenburg had left the house the night of the accident, Werner

delivered a letter to Mr. Whittenburg's children.  Because many aspects of this portion of the closing argument are challenged, we reprint it here:

> And so I want to take you back to November 30th, and I want you to do just an imagining thing with me.
>
> You recall Ann Whittenburg sitting there on the stand and saying, "Sunday afternoon we saw Mack off that day that he went to the ranch." Now, just bear with me; think with me.
>
> Imagine that there's Brit, and there's Ann, and they sent Mack off, he's on his way out there Sunday afternoon, maybe six o'clock.  Mack turns around the corner as he leaves Palacio back to I-40 and he's going to take 35 north on his way to 287 out of the Amarillo.
>
> Brit turns around and gets ready to walk back in the house, and there's an envelope sitting there on the floor, and he reaches down and he picks it up, and he gives it to Ann, and Ann opens it, and she looks at it, and it's a letter.
>
> It's a letter to Brit and to Sarah and to Cecily and to Justin and to Amanda.
>
> I'm just imagining, but listen to these facts.
>
> This letter's dated November 30th, 2003, and it's from Werner Enterprises.
>
> "Brit:
>
> "That was the last time you will ever see your dad as you now know him. You should let your siblings know this.
>
> "In just a little while, our company drivers, Jon Morlan and Marisela Neff, are going to get in one of our big semi-trucks in Limon, Colorado, and we're going to head south toward Amarillo pulling a loaded trailer. Ms. Neff will be driving.  She's too inexperienced to make this trip safely, and Mr. Morlan will be too tired to properly supervise her, and, while Mr. Morlan crawls in the truck sleeper and goes to sleep –
>
> . . .
>
> "Ms. Neff will be unable to properly follow the route that she and Mr. Morlan laid out, and she will be too confused to read the upcoming road signs.
>
> "Our drivers will arrive in Boise City, Oklahoma, just ahead of your dad, sometime around midnight or thereafter.  Ms. Neff will take a wrong turn west of Boise City, and Mr. Morlan – Mr. Morlan will be too in much of a – he'll be in too much of a blue funk to be of any help to her after she does call on him for help.

"He will refuse to take the steering wheel when she calls for his help, and she will high-center the truck on the highway when she attempts a U-turn, rather than taking a little extra time to find a place that – safe place to turn around or to call for help.  And Ms. Neff will center – will high-center this semi-truck out on the same highway that your dad will be traveling on his – on his way out of Boise City to your family's ranch.

"Once stuck on the highway, our drivers will ignore the law, and they will ignore our company procedures, and recklessly set a trap for your dad.

"Rather than setting out warning triangles and turning off the headlights on the truck, they will focus on trying to free the truck and trailer as quickly as they can so they don't have to answer to their fleet manager for the delay and downtime they are experiencing, and also so Mr. Morlan won't have to explain why he allowed his student to execute an improper maneuver while under his watch.

"At approximately 1:30 during that cold early morning of Monday, December 1st, your dad will drive his pickup right smack dab into the side of our semi-trailer at approximately 55 to 65 miles an hour because he sees nothing but blinding headlights from our semi-truck shining into his eyes.  He will be fooled into thinking that our 34,000 pounds of truck and trailer are parked safely along the eastbound shoulder of the highway.

"After he smashes into the side of the trailer and the impact literally rips the muscle and flesh off of his bones and shatters his lower right leg, our trainer, Mr. Morlan, will soon disappear into the truck and try to get himself woke up and out of his blue funk before anyone else arrives on the scene and can observe him.

"Ms. Neff will be hysterical, but, not to worry, the shift supervisor from our local Love's Truck Stop will come on the scene and she'll go back to Boise City and call for help.

"Your dad will survive the crash, and help does arrive, but he has to endure the claustrophobic remains of what's left of his pickup for nearly two hours while rescue workers work to free him from the wreckage, not knowing if they's going to burn to death or get rear-ended in the meantime.

"He will suffer serious and disabling injuries to his legs and his knees and his arms and his neck and his back.  He will come home to you a different man.

"He will suffer pain and anguish for the rest of his life.  He will suffer a loss of income and damage to his future earnings.  He will live out his days looking forward to the next corrective surgery, and then the next, and even the next.

"We will wait for your dad to sue us to recover for his damages, and then we will try to avoid full responsibility for what happened.  We will

make excuses, and our lawyers will try to blame the collision on your dad, saying it was just an accident and that he had the last clear chance to avoid it.  We will never take responsibility for our driver's actions.

"We will hire own – our own lawyers who will take your dad's life apart.  Our lawyers will focus on the fact that your dad comes from a prominent Texas Panhandle family, and our lawyers will expose every part of your dad's professional and personal life in an attempt to make the jurors think poorly of him.

"Our lawyers will accuse him of being a trust-fund baby who intentionally remained under-employed just so he could bring this lawsuit and prove damages.

"Our lawyers will hire experts and will force your dad's lawyers to hire experts in order to prove that he wasn't at fault.

"We will fight to keep out of evidence that our driver-trainee pleaded guilty to unlawfully stop – unlawfully parking a stopped vehicle that night, and we will spend thousands of dollars to have –

. . .

"We will have our experts spend – we will spend thousands of dollars to have our expert perform a nighttime photo shoot in an effort to persuade your dad and possibly jurors that he was just not paying attention on that fateful morning.

"Our lawyers will spend whatever it takes to try to talk our way out of having to be accountable for what our inept trainer and our inexperienced driver did.

"We will subject your dad to a trial if we have to.  We will do everything in []our power to convince the jury that your dad was really not all that injured in the first place, and that your dad is overreaching in trying to prove his damages.

"Of course, if none of that works, our lawyers will accuse your dad of being a failure because his law firm used to have 20 members and now it only has five.

"We will point out that he apparently lived off your Uncle George and your Aunt Ann Whittenburg simply because he couldn't make it on his own.

"We w[i]ll not mention the fact that your dad sacrificed greatly as a single father to take care of the five of you while you were growing up and then devoted years as a nighttime caregiver for your Granny Grace so she could live with honor and dignity prior to her death.

"We will ignore the fact that your dad has a sense of pride in what your Grandfather Roy accomplished before him, and we will ridicule his

love and respect for his family's heritage, and then demean him by calling his love of the Spool Ranch a mere hobby.

"Oh, and while we're at it, our lawyers will also try and discredit your dad's lawyers by hinting throughout the trial that they have attempted to influence witness testimony against us.

"Of course, none of this is true, but we'll keep using smoke and mirrors and half truths the best we can to try and shift the jury's focus away from the real issue in this case, and that is our inexperienced driver trainee and our inept driver trainer attempted an improper U-turn and got high-centered and then failed to warn oncoming traffic – traffic of the danger it created, and that is what really caused, directly caused the collision in this case.

"Sincerely, Werner Enterprises."

*Id.* at 1443-49.

This imaginary letter consumed over half of counsel's closing argument. *See id.* at 1438-51. Twice, defendants objected during its course. When counsel for Mr. Whittenburg first began to describe the fictitious letter, defendants objected on the basis that "[t]his is no comment on any evidence we've heard in this case." *Id.* at 1443. The judge overruled the objection. *Id.* When counsel for Mr. Whittenburg continued to describe the letter, defense counsel again interrupted and asked to approach the bench, stating that "[t]here's a specific thing I'd like to make a record on." *Id.* at 1447. The judge allowed him to approach the bench, overruled his objection, and granted him a continuing objection. *Id.*

In due course, the jury returned a verdict finding Mr. Whittenburg 25% negligent and defendants 75% negligent, and assessing Mr. Whittenburg's damages at $3.2 million. To reflect the jury's apportionment of liability, Mr.

- 7 -

Whittenburg's damages were ultimately reduced to $2.4 million. The defendants timely appealed the district court's judgment, seeking a new trial on a variety of grounds. We find one, concerning the remarks by counsel for Mr. Whittenburg in closing, requires reversal.

## II

The defendants argue that the district court erred in allowing counsel for Mr. Whittenburg to present an improper and prejudicial closing argument, and that a new trial is necessary to remedy the problem. Because the allegedly improper statements were objected to, the district court's decision to overrule defendants' objection and permit the argument will not be disturbed absent a clear abuse of discretion. *Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442, 1456 (10th Cir. 1997); *Shultz v. Rice*, 809 F.2d 643, 652 (10th Cir. 1986).

In approaching defendants' appeal under that deferential standard, we are mindful that "[t]he trial judge is in the best position to determine" the prejudicial effect of improper arguments, and thus whether a new trial is warranted. *Ketchum v. Nall*, 425 F.2d 242, 244 (10th Cir. 1970). Trials, after all, are ordeals where juries sit for days, if not weeks or months, entertaining evidence, argument, and instruction, and closing remarks often occupy only a fraction of what the jurors hear. Requiring a new trial is, meanwhile, a serious and costly remedy for all involved. Because the presiding trial judge is present in the courtroom throughout the proceedings, he or she is uniquely positioned to assess the

prejudicial effect of an improper argument in the context of the overall trial, as well as to fashion an appropriately tailored remedy.

Despite these institutional advantages, however, the district judge's considerable discretion in assessing the need for a new trial or other remedy is not boundless. Neither do we lack any comparative advantages in this arena. We have the opportunity to consider how individual cases fit in the context of a wider stream of cases and precedent, and to pass judgment after more deliberation than a district court can when, as here, it is forced to make snap rulings in real time on oral objections. Just as we may not review the propriety of counsel's argument without any deference to the district court's judgment, then, so too we may not merely rubber stamp the district court's judgment. In this light, our job is not to grade closing arguments, but it is to police the outer boundaries of permissible argument. Fairness to the parties and our system of justice dictates that "there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice." *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (Higginbotham, J.).

A

The permissible limits of closing argument were exceeded in this case in two principal ways. First, counsel referred extensively to evidence not in the trial record. Second, without apparent provocation or basis in the record for doing so,

counsel flooded his argument with abusive references to his opposing party and counsel.

Take first the instances where counsel prejudicially referred to evidence not in the record. Counsel conjured a letter written by Werner to Brit and Ann, Mr. Whittenburg's children, notifying them for the first time of the news of their father's accident. The jury was then presented with a detailed and fabricated image about the children receiving the letter, and was implicitly invited to place themselves in the shoes of the children, with counsel repeatedly using phrases such as "your dad" and the pronoun "you." Counsel then introduced a number of invented admissions by Werner – admissions that Ms. Neff was "inexperienced" and "too confused to read . . . road signs"; that Mr. Morlan was "too tired to properly supervise her" and was in a "blue funk"; that the two drivers together – rather than "taking a little extra time" to find a "safe place" to turn around – "ignore[d] the law" and "ignore[d] company procedures" to "recklessly set a trap" for Mr. Whittenburg; and that the drivers did so "so they don't have to answer . . . for the delay and downtime" and so Mr. Morlan didn't have to explain why he allowed Ms. Neff to "execute an improper maneuver."

Before us, the parties fight considerably over the propriety of ever using an imaginary letter as a way to structure a closing argument. But we need not resolve today an abstract debate over the proper *form* of closing arguments because in this case there is a more pressing problem. Even assuming the

possible propriety of the technique generally, the *content* of this particular

imagined letter included a great many facts about Mr. Whittenburg's children and

Werner's conduct that lacked any basis in the evidence adduced at trial.

Counsel's argument accordingly violated the cardinal rule of closing argument:

that counsel must confine comments to evidence in the record and to reasonable

inferences from that evidence. *See Lambert v. Midwest City Memorial Hosp.

Auth.*, 671 F.2d 372, 375 (10th Cir. 1982); *see also* Model Rules of Prof'l

Conduct R. 3.4 ("A lawyer shall not . . . in trial, allude to any matter that the

lawyer does not reasonably believe is relevant or that will not be supported by

admissible evidence."); Restatement (Third) of Law Governing Lawyers § 107

(2000); Jacob Stein, Closing Arguments, § 1:14 (2d ed. 2005) ("[C]ounsel is

restricted to the law in the case, the evidence adduced from the witnesses, the

exhibits admitted into evidence, and the inferences reasonably deductible from the

testimony and exhibits.").

The invented facts placed before the jury were also plainly calculated to

arouse its sympathy, evoking, as they did, images of plaintiff's children receiving

for the first time news of their father's injuries, implicitly asking the jury to place

themselves in the shoes of the children, and portraying Werner as repeatedly

admitting to reckless conduct. What's more, as these admissions were couched in

terms of Werner planning future actions to harm Mr. Whittenburg, the closing

argument at least subtly, if not overtly, placed before the jury the suggestion that

Werner acted with a degree of calculated intentional malevolence – a suggestion that had no foundation in this trial on negligence. Several of our sister courts have recognized the prejudicial nature of similar arguments and have found them sufficiently problematic, even standing alone, to warrant reversal. *See Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 286 (5th Cir. 1975) (reversible error found in part because in closing counsel evoked imagery of decedent's children crying over decedent's grave site); *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1303-04, 1303 n.4 (8th Cir. 1987) (remanding for new trial on issue of damages in part because counsel in closing argument referred to Thanksgiving holiday at plaintiff's household where one daughter, killed in an accident, would be missing, and further commented on the "loss of the heart and soul of a family"); *Chicago & N.W. Ry. Co. v. Kelly*, 84 F.2d 569, 576 (8th Cir. 1936) (reversible error found in part because counsel asked jury to place themselves in the position of the plaintiff's mother, son, or husband, "[a] position which would have disqualified them to act as jurors"); *cf. Moser v. State*, 544 P.2d 424, 427 (Nev. 1975) (finding improper prosecutor's closing argument that imagined a hypothetical letter from defendant to decedent's family at Christmas, but declining to reverse for new trial).

But these are not the only problems with counsel's argument. In this case, counsel went much further, devoting approximately a quarter of his closing argument (14 paragraphs' worth) – to vituperative attacks on defendants and their

counsel – attacks that likewise had no basis in evidence adduced at trial. Counsel's imagined letter is littered with putative confessions from Werner that it improperly took this case to trial; that it spent vast sums of money to avoid responsibility; that it purposefully mounted an improper and dishonest defense in which it unfairly ridiculed Mr. Whittenburg, presented a one-sided view of the evidence, "forced" and "subjected" Mr. Whittenburg to a trial, and used "smoke and mirrors and half truths" in order "to try and shift the jury's focus away from the real issue in this case."

This line of argument is especially concerning. Every individual and entity has the right to mount a non-frivolous defense against allegations of negligence or other misconduct. In preparing that defense, a party can – indeed, often must – spend not inconsiderable amounts of money on both representation and experts. In this respect, the right to present a defense is materially identical to the right to pursue a lawsuit, and we would be equally troubled had counsel for Werner suggested Mr. Whittenburg acted reprehensibly in bringing his suit for damages. To imply or argue that the mere act of defending oneself, or the mere act of bringing suit, is reprehensible serves no proper purpose, and for time out of mind it has been the basis for appellate courts ordering new trials. *See, e.g., New York Cent. R. Co. v. Johnson*, 279 U.S. 310, 318 (1929) (Stone, J.) (reversing for new trial in light of "bitter and passionate attack on petitioner's conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the

jury"); *Morrissey*, 821 F.2d at 1303-04, 1303 n.4 (reversing for new trial on issue of damages in part because counsel in closing argument commented that defendant-company "spent large amount on the defense of the case to blame everyone but himself for the collapse" of building wall); *F.W. Woolworth Co. v. Wilson*, 74 F.2d 439, 442-43 (5th Cir. 1934) (reversing for new trial in part because counsel in closing declared opposing party's case to be "trumped up"); *Draper*, 580 F.2d at 96 (finding improper "repeated vituperative and insulting references to the defendants and defendants' counsel"); *Howard v. State Farm Mut. Auto Ins. Co.*, 316 S.Ct. 445, 450 (1994) (cautioning bar against form of closing argument where counsel talked about opposing party going out and hiring "the biggest, baddest law firm in the State," having "resources" and being willing to "fight us for every dime," and spending large sums of money defending its case). It is not the function of closing argument "to debase, degrade or impugn the veracity of a litigant" or opposing counsel. Stein, *supra* at § 1:30, § 1:37 (Attack upon counsel; Attack upon civil litigant); Model Rules of Prof'l Conduct R. 3.4 ("A lawyer shall not . . . in trial . . . state a personal opinion as to the justness of a cause, the credibility of a witness, [or] the culpability of a civil litigant . . . . ). Our system instead proceeds on the premise that counsel

generally should focus on the merits of the case at hand, and that they can disagree about those merits without being disagreeable.[1]

Of course, there are cases where illegitimate defenses and claims are pursued. But for a party who believes his or her opponent has abused the judicial system either in bringing a frivolous lawsuit or fronting a frivolous defense, there exist other remedies, ranging from sanctions (including fees and costs), to bar referrals, to claims for abuse or malicious use of process. A party need not, and ought not, resort to the self-help of vituperative *ad hominem* attacks during the final minutes before the jury. To be sure, some courts have recognized that counsel may sometimes be provoked by improper conduct into responding in kind; without condoning such tit-for-tat behavior, courts in these circumstances have sometimes held that equally bad behavior by both sides may effectively "cancel out" any prejudice. *See* Stein, *supra* at § 1.32. But counsel's attack in this case was apparently unprovoked, let alone by any impropriety on the scale

---

[1] Moreover, while counsel did not explicitly mention Werner's financial resources, he raised the specter of Werner's wealth by alluding, more than once, to the vast amount of money spent on defense. *See, e.g.*, App. at 1447 ("[W]e will spend thousands of dollars to have our expert perform a nighttime photo shoot. . . ."). Comments on the wealth of a party have repeatedly and unequivocally been held highly prejudicial, and often alone have warranted reversal. *See, e.g.*, *Hoffman v. Brandt*, 421 P.2d 425, 428 (Cal. 1966) (reversal solely on improper reference, in closing, to party's pecuniary straits, and stating that "[j]ustice is to be accorded to rich and poor alike, and a deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case"); *see generally* Stein, *supra* at § 1:39 (Financial status of civil litigant).

counsel pursued in his closing argument. Our jury system relies on individuals chosen from the community to evaluate and resolve conflicts in evidence presented by opposing counsel, and an inappropriate and prejudicial advantage is sought when one counsel levels unsubstantiated and unprovoked charges that his or her opponent has acted with deceit and trickery.

B

That counsel's closing remarks were improper is one thing; that they rise to the high level required to merit reversal under our case law is quite another. In this case, however, three separate factors, long used to mark the boundaries between when a new trial is and is not required, are present. Collectively, they indicate that this argument is an outlier, beyond the realm of what we may affirm.

First, the remarks were not "minor aberrations" made in passing. We have often held that a stray improper remark in closing is no basis for upsetting a trial and requiring the parties and district court to redo their ordeal. *See*, *e.g.*, *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 591 (10th Cir. 2007); *Garcia v. Sam Tanksely Trucking, Inc.*, 708 F.2d 519, 522 (10th Cir. 1983). But in this case, counsel's improper comments were repeated and emphasized throughout closing argument – in total, the imagined letter occupied more than half of closing argument, and the attacks on counsel and defendant occupied about half of that letter. Far from coming in passing, they were the heart and soul of the argument. Their sheer quantity and acrimony cannot be shrugged off, and we have held that

where, as here, "counsel truly overemphasizes an improper argument . . . we [will] find the requisite prejudice and order a new trial." *King*, 485 F.3d at 591; *see also Johnson*, 279 U.S. at 317 (reversing for a new trial in light of the "repeated" and "vituperative" nature of counsel's improper comments).

Second, the district court declined to take any specific curative action. We have held curative instructions – issued promptly after the improper argument and specifically addressing the precise impropriety complained of – can go far in erasing prejudice occasioned by an improper remark. *See, e.g.*, *Bland v. Sirmons*, 459 F.3d 999, 1022-23 (10th Cir. 2006).[2] But here, rather than offering such an instruction, the district court overruled both of the objections defense counsel raised to his opponent's argument. In such circumstances, "[t]he failure of the trial judge to sustain petitioner's objection or otherwise to make certain that the jury would disregard the [improper] appeal could only have left them with the impression that they might properly be influenced by it in rendering their verdict." *Johnson*, 279 U.S. at 318.

To be sure, we have sometimes suggested that a general instruction at close of trial, reminding the jury that counsels' arguments are not evidence, can help

---

[2] *See also United States v. Harlow*, 444 F.3d 1255, 1260, 1266 (10th Cir. 2006); *United States v. Lauder*, 409 F.3d 1254, 1261-62 (10th Cir. 2005); *Hawkins v. Mullin*, 291 F.3d 658, 675 (10th Cir. 2002); *United States v. Coleman*, 7 F.3d 1500, 1505-06 (10th Cir. 1993); *United States v. Lowder*, 5 F.3d 467, 473-74 (10th Cir. 1993); *United States v. Oles*, 994 F.2d 1519, 1523-24 (10th Cir. 1993); *United States v. Langston*, 970 F.2d 692, 701-02 (10th Cir. 1992); *United States v. Martinez-Nava*, 838 F.2d 411, 416-17 (10th Cir. 1988).

mitigate an improper closing argument. *See, e.g.*, *United States v. Roberts*, 185

F.3d 1125, 1144 (10th Cir. 1999).[3]  And, Mr. Whittenburg stresses, such an

instruction was offered here. *See* Jury Instruction 4.[4]  But in each case where we

pointed to a general instruction included in the court's final instructions as a

circumstance suggesting the harmless nature of improper argument, there were

other, additional, and stronger reasons we cited for finding the improper closing

argument non-prejudicial.  *See, e.g.*, *Roberts*, 185 F.3d at 1144 (overwhelming

evidence on which jury could have based its verdict).  Our precedent suggests,

then, a sliding-scale:  the more improper the argument and the more prejudicial

the circumstances, the more specific and timely must be the curative instruction.

Here, where the improper comments were extensive and the district court

expressly overruled a contemporaneous objection, we cannot say a general

instruction, issued much later and merely reminding the jury that the lawyers'

arguments are not evidence, is fairly scaled to the size of the problem.  The

district court's decision to overrule the objection to counsel's argument and deem

---

[3]  *See also Fero v. Kerby*, 39 F.3d 1462, 1473-74 (10th Cir. 1994); *United States v. Manriquez Arbizo*, 833 F.2d 244, 248 (10th Cir. 1987); *United States v. Espinosa*, 771 F.2d 1382, 1401 (10th Cir. 1985).

[4]  In pertinent part, the instruction read,"[r]emember that any statements, objections, or arguments made by the lawyers are not evidence in the case.  The function of the lawyers is to point out those things that are most significant or helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.  In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding on you."

it appropriate was never undone and remained the most specific and timely guidance from the court to the jury with respect to the propriety of counsel's closing remarks.

Third, and finally, the apportionment of liability and the size of the damage award, while not beyond the bounds of rationality, suggest that counsel's comments had a prejudicial effect. We have previously held that the size of a verdict – whether it is large or excessive – is a significant factor suggesting prejudice sufficient to require a new trial. *See Ketchum*, 425 F.2d at 244. Here, the question of apportionment of liability for the accident was hotly disputed, with considerable competing evidence presented by both sides, and the jury found defendants three times more blameworthy than Mr. Whittenburg. Moreover, the damage award – $3.2 million – was at the high end of the evidence presented to the jury. Mr. Whittenburg presented evidence that his medical expenses to date totaled $349,776, and that his future medical expenses might be as high as $348,139. Aplt. App. at 751-53; 732-37. An economist for Mr. Whittenburg testified that Mr. Whittenburg's future economic loss from not being able to perform fully his job ranged from $1.1 million to $2.43 million, and future economic loss from not being able to perform fully work on his ranch ranged from $70,000 to $139,000. Supp. App. at 1242-43, 1244. Mr. Whittenburg thus presented the jury with evidence that his physical and economic injuries, excluding pain and suffering, amounted to between $1,867,915 and $3,266,915.

The jury's ultimate award of $3.2 million was certainly within this range, especially when accounting for pain and suffering, but it was also certainly at the high end. While "[w]e think it is not humanly possible to measure the effect upon the minds of jurors of such an argument as was made," given the jury's damage award at the high end of the damages range available to it, and its apportionment of relatively little responsibility to Mr. Whittenburg, neither in this case can we "say that it did not accomplish the purpose which it was clearly intended to accomplish; namely, the enhancement of damages." *Kelly*, 84 F.2d at 576.

## C

In light of the confluence of these three factors – the extensiveness of the improper remarks, the absence of any meaningful curative action, and the size of the verdict – we find ourselves compelled to conclude that this case must be retried. In so concluding, however, we underscore that our decision is not based on any one of these factors singly, but rather their combination after considering the argument as a whole. We also emphasize that closing argument need not, nor should, be a sterile exercise devoid of passion. Parties are "entitled to have someone speak with eloquence and compassion for their cause." *Draper*, 580 F.2d at 95. "Arguments may be forceful, colorful, or dramatic, without constituting reversible error." *Kelly*, 84 F.2d at 576. Counsel may "resort to poetry, cite history, fiction, personal experiences, anecdotes, biblical stories, or tell jokes." Stein, *supra* at § 1.14 (Scope of permissible argument). But one

thing they may not do is use closing argument to introduce massive amounts of putative evidence not in the trial record and then proceed to launch broadside attacks on an opposing party's right to bring suit or defend itself. While always reluctant to reverse the district court in matters concerning trial misconduct, and to burden both that court and the parties with a new trial, our appellate role – a role that compels us to mark and guard the outer boundaries of acceptable trial conduct – does not permit us to sit this one out.

## III

Because we reverse on the basis of an improper closing argument, we need not reach the remaining issues defendants raised on appeal.[5] We do, however, pause to note an additional error in the last trial that should be avoided in the new one. The district court instructed the jury that it could find the defendant negligent *per se* if it found a violation of any of three statutes concerning the operation of motor vehicles. *See* Jury Instruction 16A. None of these statutes, however, bore on the facts of this case. Two of the statutes, Okla. Stat. tit. 47, § 11-301(A) & § 11-309(1), aim to ensure drivers remain within a single lane, and in particular the right lane unless passing or overtaking other vehicles, and do not deviate from that lane until ascertaining that they can do so safely. The statutes bore no application to the facts proved at trial because no one alleged that Werner's drivers were improperly in the left lane or imprudently

---

[5] We likewise note that Mr. Whittenburg has withdrawn his cross-appeal.

- 21 -

changing lanes.  Similarly, Okla. Stat. tit. 47, § 11-1001(A)(1) is aimed at preventing people from "stop[ping], park[ing], or leav[ing] standing" their vehicles in unsafe positions.  Yet neither party alleged that Werner's drivers stopped or parked their truck across Highway 325; it is undisputed that the truck became stuck despite the intentions of the Werner drivers to make a legal U-turn and continue driving.  This statute too, therefore, was erroneously offered as a basis for a finding of negligence *per se*.

* * *

The judgment is reversed and this matter is remanded for a new trial.