**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 14, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KAREN BIRD, an individual,

     Plaintiff - Appellant,

v.

WEST VALLEY CITY, a political
subdivision of the State of Utah; KELLY
DAVIS, in his official and individual
capacities,

     Defendants - Appellees.

No. 19-4050
(D.C. No. 2:12-CV-00903-EJF)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE** and **CARSON**, Circuit Judges.
_____

Plaintiff Karen Bird was employed from 2001 to 2011 at the West Valley City

Animal Shelter (the Shelter). In late 2011, West Valley City (the City) terminated

her employment. Bird then filed this action asserting both federal and state claims.

Bird claimed, in pertinent part, that the City and her immediate supervisor, defendant

Kelly Davis, violated 42 U.S.C. § 1983 by terminating her in violation of her First

Amendment rights because they believed that she leaked information to the public

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

about certain events that transpired at the Shelter. The case proceeded to trial, where a jury found in favor of defendants. Bird now appeals, arguing that the district court erred in denying her motion for new trial, and in employing certain language in the verdict form. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

The following facts were established at the trial in this case. In 2001, Bird, a resident of Salt Lake County, Utah, graduated from a veterinary technician program at a local community college. Shortly thereafter, in August 2001, Bird began working at the Shelter. Bird's supervisor at the time of her hire was Davis, who was a retired City police officer.

In 2002, Davis promoted Bird to the position of Shelter manager. At that time, Davis had no concerns about Bird or her performance, and he perceived their relationship to be very good. Bird, for her part, described Davis's management style as "gruff." Aplt. App. at 589.

In 2007, Davis was promoted to the position of Director of Operations of Animal Services. As Director of Operations of Animal Services, Davis began reporting to Layne Morris, the Director of the City's Community Preservation Department.

In the spring of 2009, Bird was involved in a serious car accident. Due to injuries sustained as a result of the accident, Bird was on leave from work for several months. During that time, Davis directly managed the Shelter's operations and changed some of the existing procedures.

2

The relationship between Bird and Davis began to deteriorate after Bird returned to work. One component in the deterioration of the relationship was a disagreement regarding the use of the Shelter's gas chamber. Bird disfavored that method of euthanasia and, by her own admission, directed employees not to use the gas chamber for animals that were old, young, or sick. Bird also preferred that the gas chamber not be used at all and, consequently, generally discouraged employees from using it. Davis, in contrast, generally favored the use of the gas chamber for euthanasia.

From the time of her return to the Shelter in 2009 through late 2010, Bird regularly met with Morris and complained about Davis. According to Morris, Bird complained that Davis did not like her or her ideas, and expressed general displeasure with his leadership of the Shelter. Unbeknownst to Morris, Bird recorded all of her meetings with Morris, as well as meetings that she had with Davis and other City employees.

As Bird's visits to Morris's office became more frequent and the relationship between Bird and Davis deteriorated, Morris talked with Davis and encouraged him to try and make Bird feel more a part of the Shelter management team. According to Morris, Davis made genuine efforts to do so, but Bird did not make equivalent efforts to better her relationship with Davis.

In June of 2010, Davis met with Morris and informed him that he was experiencing communication difficulties with Bird. Davis also informed Morris that he believed that Bird was actively trying to undermine his authority at the Shelter.

3

Davis noted that, due to these issues, he had met with Bird and attempted to clarify their respective roles at the Shelter.

At some point in 2010, Morris met with Davis and said that he thought they needed to conduct a disciplinary hearing for Bird. Davis asked for a few days to think about that option; after doing so, Davis said he would like to wait. Bird, however, continued to complain to Morris about Davis. By the end of 2010, Morris talked to Davis about the possibility of terminating Bird's employment. Davis again told Morris that he did not want to do that.

Davis did, however, document in writing his dissatisfaction with Bird's performance. In December 2010, Davis gave Bird a written performance review in which he noted, in part, that Bird "ha[d] difficulty accepting [his] role and responsibility as director." *Id.* at 713. Davis further noted in his review that Bird "tend[ed] to not accept feedback or criticism as well as she could," and "had difficulty either understanding direction given or chooses not to follow the direction given" in areas such as "cleaning protocol, euthanasia policy, personnel evaluation, [and] volunteer program." *Id.* at 713–14. Shortly thereafter, Davis provided Bird with a Memorandum of Understanding that outlined the various ways in which he believed she was undermining his authority and resisting his desired direction for the Shelter.

On October 13, 2011, an incident occurred at the Shelter that resulted in negative publicity for the Shelter. Bird and another employee or volunteer had just finished euthanizing a large dog and were moving the dog's body to a dumpster when

4

they heard sounds coming from inside the dumpster. Bird and the other person opened a bag that was in the dumpster and discovered a cat that was alive and covered in vomit and feces. Bird and the other person placed the cat in a kennel inside the Shelter. Bird learned that the Shelter's staff had attempted to euthanize the cat, after deeming it unadoptable, but had not realized that the process failed. Bird then talked with Morris and asked if she could take the cat to a rescue organization because the Shelter did not have any money to pay for a veterinarian to examine the cat. Morris agreed to this proposal. Bird also advised Morris that she would have to tell the rescue organization what happened to the cat and that the rescue organization would likely make this information public. Morris purportedly said, "okay, we'll be alright." *Id.* at 607. After Bird took the cat to a local rescue organization, news stories began to appear about the incident, and various City officials, including Morris, began receiving inquiries about the incident.

On October 26, 2011, Davis conducted a meeting at the Shelter with Bird, other Shelter employees, and volunteers. Prior to the meeting, Bird had allegedly been attempting to persuade City management to transform the Shelter into a no-kill facility. During the meeting, Davis told Bird that if she was unwilling to prepare a list of the animals currently in the Shelter that needed to be euthanized, he would do so. Shortly after the meeting, a Shelter volunteer named Michelle Johnson, who was close with Bird, made a Facebook post that said "West Valley [Shelter] is so overflowing right now they need help! The big man said bring the numbers down. Bring down the numbers now. He wants them DEAD today!" *Id.* at 535.

5

On October 31, 2011, Davis and Morris met with Bird. Morris discussed the negative emails and phone calls that the City was receiving regarding the Shelter. Davis said that he believed that someone at the Shelter, either an employee or a volunteer, was providing information to the media. Davis stated that he wanted to "investigate and eradicate" this problem. *Id.* at 620.

On November 1, 2011, Morris met with Bird and Johnson, the volunteer who made the Facebook post. During the first part of the meeting, Morris stated that the Shelter was being placed in a bad light and that could ultimately result in him deciding not to allow volunteers to work at the Shelter. Morris then excused Johnson from the meeting and met privately with Bird. Morris informed Bird that he did not think that Bird and Davis could work together and that there would be some changes. Morris also stated that he had already talked with the city manager and the assistant city manager about the situation.

On November 2, 2011, Bird filed a written complaint against Davis with Shirlayne George, the City's human resource manager. George met with Bird the following day to discuss the complaint. Bird stated that her relationship with Davis had deteriorated over the previous few weeks and that she could not bear to look at Davis. Bird also gave George an audio recording of an encounter between Bird and Davis that, according to Bird, demonstrated Davis bullying Bird. Both George and Morris listened to the audio recording, and both concluded that it did not support Bird's allegations, and instead demonstrated Davis's patience and attempts to work with Bird. On November 9, 2011, George sent Bird an email stating that she had

6

determined that Bird had not been placed in a hostile environment by Davis and that, instead, Davis was trying to help Bird. According to George, both Bird and Davis had gruff personalities and relatively poor communication skills, but she believed that Davis was attempting to work on his deficiencies, whereas Bird was not.

On November 9, 2011, Morris met with Bird and informed her that he had initiated disciplinary proceedings against her. The following day, Bird met with Paul Isaac, the assistant city manager, and George. During that meeting, Isaac asked Bird to resign. Bird told Isaac that she loved her job and would not resign. Isaac placed Bird on administrative leave pending the outcome of the disciplinary proceedings.

On November 14, 2011, George conducted an investigation into all of the supervisory staff members employed at the Shelter, including Bird and Davis. According to George, Bird received the most complaints from employees during the investigation. Specifically, Shelter employees complained that Bird was "aggressive and demeaning to her staff," was "hard to talk to because she [wa]s always so defensive," and was "never happy," which brought "the whole staff down." *Id.* at 1061. George concluded that the issues with Bird were severe to the point that she was not sure that they could be fixed.

Morris, after reviewing the results of George's investigation, sent a letter to Bird on November 16, 2011, noting that "the Department ha[d] completed an investigation of various apparent failures on [her] part to perform [her] responsibilities as the West Valley City Animal Shelter Manager." *Id.* at 639. The letter further stated that, based upon the investigation, it appeared that Bird had been

7

consistently insubordinate to Davis by arguing with him about various issues in front of the Shelter staff.

On November 22, 2011, Morris held a hearing on the allegations contained in his letter of November 16, 2011. One week later, on November 29, 2011, Morris terminated Bird's employment with the City. Morris informed Bird of the termination both by letter and voicemail.

Bird appealed her termination to George, the human resources director. On or about December 15, 2011, George sent Bird a letter denying Bird's appeal. George concluded in her letter that the termination was based solely on Bird's actions and reactions to her workplace environment. George noted that almost every employee at the Shelter stated that Bird failed to be courteous both to Davis and her employees. George also concluded that Bird had inappropriately disciplined employees in front of others. Lastly, George noted that almost everyone employed at the Shelter complained about Bird's constant negative attitude, and that Bird was confrontational, defensive, and discourteous to Davis.

Bird unsuccessfully appealed to the assistant city manager, and then to the Employee Appeals Board. After exhausting her administrative appeals, Bird filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging the City discriminated against her on the basis of sex. On June 27, 2012, the EEOC issued Bird a notice of right to sue.

8

## II

On September 24, 2012, Bird initiated these proceedings by filing a complaint in the United States District Court for the District of Utah against the City and Davis. Bird asserted a variety of claims under federal and state law including, as relevant here, a claim under 42 U.S.C. § 1983 for violation of her First Amendment rights. More specifically, Bird alleged in that claim that the City and Davis had retaliated against her because they "believed that [she] had raised with the media concerns about the effectiveness and cruelty of the 'gas chamber' the City uses to euthanize animals." *Id.* at 31–32.

The district court initially granted summary judgment in favor of the City and Davis on all of Bird's claims. Bird appealed to this court. We affirmed the district court's grant of summary judgment on all of Bird's claims, except for her § 1983 First Amendment retaliation claim. As to that claim, we reversed the district court's grant of summary judgment and remanded the claim to the district court for further proceedings. *Bird v. West Valley City*, 832 F.3d 1188, 1193, 1213 (10th Cir. 2016) (*Bird I*).

The First Amendment retaliation claim proceeded to trial in March of 2018. At the conclusion of the evidence, the jury returned a verdict in favor of defendants.

Bird subsequently filed a motion for new trial. In that motion, Bird argued that defense counsel engaged in misconduct at trial that included, in part: (1) questioning Morris about the details of his military experience; (2) relying on Morris's military experiences in closing to suggest that Morris would not lie; and

9

(3) falsely suggesting that Morris was the subject of a new movie and that his character was being played by a famous actor. The district court denied Bird's motion for new trial.

Bird filed a timely notice of appeal.

## III

Bird asserts two general issues in her appeal. First, she argues that the district court erred in denying her motion for new trial. Second, Bird argues that the language used by the district court in the verdict form was erroneous. For the reasons discussed below, we reject both of these issues.

### *The denial of Bird's motion for new trial*

Bird's motion for new trial focused on a small portion of the testimony of Morris, the individual responsible for her termination, and defense counsel's purported misuse of that testimony during closing arguments. According to Bird, "[t]he district court improperly allowed Defendants to present extensive evidence of the military experience of . . . Morris . . . ." Aplt. Br. at 24. Bird concedes that "some background evidence is appropriate," but she argues that "the evidence was clearly being used in this case to arouse the jury's passion and sympathy." *Id.* She further argues that "[t]he court then improperly allowed Defendants to rely on that evidence in closing arguments to vouch for . . . Morris's integrity and bolster his credibility." *Id.* Bird argues that "[b]ecause . . . Morris was the sole decision-maker in this case, his credibility and motivations were paramount to that of all other witnesses." *Id.* "Therefore," she argues, "the unmitigated errors in allowing the

10

introduction and use of the prejudicial evidence deprived [her] of a fair trial, and this Court should remand for a new trial." *Id.*

### a)  Standards of review

We review for abuse of discretion a district court's ruling on a motion for new trial. *Harte v. Bd. of Commrs. of Johnson Cnty.*, 940 F.3d 498, 519 (10th Cir. 2019). "A district court abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019). "A new trial cannot be granted unless the error was prejudicial and affects the party's substantial rights." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008).

We also "review a district court's evidentiary rulings for abuse of discretion, considering the record as a whole." *United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1266 (10th Cir. 2020) (quotations omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "But even relevant evidence should be excluded under Federal Rule of Evidence 403 'if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury.'" *Cristerna-Gonzalez*, 962 F.3d at 1266 (quoting Fed. R. Evid. 403).

As for defense counsel's closing arguments, because Bird objected to those arguments, "the district court's decision to overrule [her] objection and permit the argument will not be disturbed absent a clear abuse of discretion." *Whittenburg v.*

*Werner Enters. Inc.*, 561 F.3d 1122, 1127 (10th Cir. 2009).  In applying that standard, "we are mindful that '[t]he trial judge is in the best position to determine' the prejudicial effect of improper arguments, and thus whether a new trial is warranted."  *Id.* (quoting *Ketchum v. Nall*, 425 F.2d 242, 244 (10th Cir. 1970)).  That said, "the district judge's considerable discretion in assessing the need for a new trial or other remedy is not boundless," and this court's "job . . . is to police the outer boundaries of permissible argument."  *Id.*

In *Whittenburg*, we identified "three separate factors, long used to mark the boundaries between when a new trial is and is not required."  *Id.* at 1131.  These three factors include: (1) the extent of the improper remarks; (2) whether the district court took curative action; and (3) the apportionment of liability and the size of the damage award. *Id.* at 1131–33.  "In general, these three factors require courts to compare the propriety of the challenged remarks against the weight of the evidence adduced at trial."  *Burke*, 935 F.3d at 1026.  "[T]he inappropriate remarks must be substantial enough to undermine our faith that the jury's verdict was fairly obtained."  *Id.*

### b)  Morris's testimony about his background

Bird presented Morris as a witness during her case-in-chief.  On cross-examination, defense counsel began by asking Morris about his background. This included questions about his extensive military service.  This portion of the cross-examination proceeded as follows:

> Q. Let me go back and get a little background on you, Mr. Morris. Did you have post high school education?
> A. I do.

12

Q. And what degrees did you obtain? Where did you obtain them?

A. I -- I went to -- I attended -- I graduated from Brigham Young University with a degree in cartography and attended the University of Utah Master of Public Administration Program.

Q. Cartography?

A. Making maps.

Q. Okay, I wasn't sure. When did you get your degree at BYU?

A. When?

Q. Yeah.

A. I was on the 11 year program to get my degree and so I graduated in '89, if I remember right.

Q. All right. Did you serve in the military?

A. I did.

Q. Tell me about that?

A. I enlisted in 1983.

Q. Enlisted where?

A. In the United States Army.

Q. Okay. And how long did you serve in the Army?

A. Until I was medically retired in 2000 -- I think it was 2004.

Q. Okay. Did you do any specialized training in the U.S. Army?

A. I did. I attended the John F. Kennedy School of Special Warfare at Fort Bragg North Carolina to enlist in Special Forces.

Q. Did you obtain a Special Forces designation?

A. I did. I graduated from that program and got my Green Beret.

Q. You're a Green Beret?

A. Yes, sir.

Q. How long does it take to get that?

A. It's a couple of years. You go through the school of misery and hard knocks type of thing.

Q. What kind of training do you have?

A. Been to Special Forces School, advanced demolition explosives school, scuba school, airborne school, close core combat, all different types of training that you go through to get that designation.

Q. Did you ever deploy overseas?

A. Went -- I was activated and went to Afghanistan in November of 2001.

Q. November of 2001?

A. Right.

Q. So that was what, two months after 9-11?

A. It was.

Q. What did you do in Afghanistan?

13

A. You know the military term would be deny free movement to Taliban forces and overthrow the country essentially. We were leading an insurgency with local Afghans who were disaffected with the government and then we tracked down high value targets that we were assigned to interdict.

Q. All right. So what government were you trying to overthrow?

A. The Taliban government who were running Afghanistan at that time.

Q. Were you engaged in searches for Osama Bin Laden or others?

A. I was.

Q. Tell me about that?

A. You know, one of the -- one of the targets was Osama Bin Laden's wife. And she had had -- one of his wives had a -- had rented a home in Kabul and so we -- we showed up at that home to see if possibly she was there, maybe he was there. And he – he wasn't there, she wasn't there, she had already fled so we ended up spending the night at that -- at that location. So people ask me all the time if I got -- why I didn't get Osama Bin Laden and I tell them I didn't get Osama Bin Laden, but I did spend the night at his wife's house.

Q. You said you were medically discharged?

A. Right.

Q. What caused that?

A. During one particular fire fight I took a grenade shrapnel through my right eye which blinded me and ended up going back and damaging my inner ear.  So I'm a little bit off balance and blind in the right eye.

Q. Now, who were you trying to interdict on that -- in that fire fight?

A. We were after Bin Laden's finance guy who was a man from Canada who was running an international charity which was just a cover for fundraising for al-Qaeda.

Q. And how was it that you got wounded, what were you doing?

[Bird's counsel]: Objection, Your Honor, as to relevance of this testimony.

THE COURT: I'll give you some latitude.

[Defense counsel]: Sure. Thank you, Your Honor.

THE WITNESS: I was -- I was wounded during a fire fight where -- where we were after a guy that the finance guy and I -- I was shooting my -- I carry the 203 grenade launcher and I popped up to shoot a couple of guys with it who had thrown a grenade at me and the grenade went off and that's when the shrapnel hit me -- hit me in the face.

Q. (By [defense counsel]) You received decorations in that -- for that fire fight, did you not?

14

A. I did.

Q. What decorations did you receive?

A. Purple Heart and a Bronze Star.

Q. A Bronze Star. You're being modest a Bronze Star with Valor, correct?

A. Yes.

Q. You also received the Medal of Honor from the State of Utah, did you not?

A. I did. I had forgotten that's what it was called but yeah.

Q. Been on 60 Minutes?

A. Yes.

Q. An honorary guest at the Rose Bowl Parade?

A. Yes, rode on a float.

Q. How long did it take you to recover from that grenade, taking that grenade fragment in the face?

A. You know, the physical recovery is – was relatively short. You know, you're just missing an eye and eventually your other eye after I don't know a year your other eye is pretty well strong enough to take over the looking duties. Um, you know, mentally it is a little tougher to kind of acclimate to the new normal, I guess.

Q. All right. When did you go to work for West Valley City?

A. I started with West Valley City when I'd gotten out of the Army. It would have been 1995.

Q. Okay. But you still continued reserve apparently because you got reactivated a few years later, right?

A. Right. I was actually back at Fort Bragg when 9-11 happened.

Aplt. App. at 1187–93.

In her motion for new trial, Bird argued, in part, that defense counsel engaged in misconduct by presenting irrelevant evidence of Morris's military background. The district court denied Bird's motion and specifically rejected her argument that evidence of Morris's military background was irrelevant:

> Mr. Morris's testimony concerning his military experience was relevant and admissible as background evidence. Such evidence helped the jury to get to know the witness and assess his credibility. Notably, Ms. Bird does not cite any cases to the contrary, simply arguing without support that evidence concerning Mr. Morris's military experience is irrelevant, and West Valley Defendants' counsel should not have introduced it.

15

Accordingly, the Court finds West Valley Defendants' counsel did not improperly introduce evidence concerning Mr. Morris's military background.

*Id.* at 164.

In her appeal, Bird concedes "that some such evidence might be acceptable background evidence." Aplt. Br. at 28. But, she argues, defense counsel, "[i]n questioning . . . Morris, . . . went far beyond what could be considered reasonable background information." *Id.* Bird argues that her counsel "objected at the point that Defendants' counsel began asking about information that was clearly intended to garner sympathy for . . . Morris," and specifically "objected to counsel's question about how . . . Morris got wounded in Afghanistan." *Id.* Bird argues that the questions posed by defense counsel after her counsel's objection was overruled were asked by defense counsel for the sole purpose of "convey[ing] to the jury . . . Morris's war hero status." *Id.* at 29. Bird in turn argues that "[t]he fact that . . . Morris was wounded in Afghanistan or received awards for his service has no bearing on his reasons for terminating [her]." *Id.*

We agree with Bird that certain of the questions posed by defense counsel to Morris appear to have been designed to bolster Morris's standing in the eyes of the jury, rather than to elicit information relevant to the issues in the case, or even to Morris's background or credibility. In particular, the questions posed to Morris about his searches for Bin Laden and his associates, his appearance on 60 Minutes, and his participation in the Rose Bowl Parade, fall into this category. The answers to those

questions were clearly irrelevant to the issues that the jury was being asked to decide, and they in turn had nothing to do with Morris's credibility.

That said, we are not persuaded that the admission of this testimony from Morris was prejudicial to Bird or otherwise affected her substantial rights. To be sure, Morris was the person who decided to terminate Bird's employment with the City. But Morris did not directly supervise Bird and, although he met with Bird several times at her request, he relied in large part on information provided by Bird's direct supervisor, Davis, and the City's human resource director, George. Both Davis and George testified at length during the trial, and both offered information that amply supported Morris's conclusions that Bird was insubordinate, failed to perform some duties that Davis asked her to perform, was not courteous or cooperative with her employees, and was ultimately unable to work with Davis. Moreover, the evidence presented at trial established that Bird was afforded three levels of appeals within the City's system, and that Morris's conclusions were affirmed at all three levels. Thus, we conclude that the district court did not abuse its discretion in denying Morris's motion for new trial on the basis of the admission of this testimony.

### c) *Defense counsel's closing arguments*

Near the end of his closing argument, defense counsel touched on the credibility of witnesses and, in doing so, specifically discussed the issue of Morris's credibility:

> [Defense counsel]: Credibility of witnesses. For you to find that the City acting through the final decision-maker who was Layne Morris terminated her because of a free speech retaliation motive, you have to

find that Kelly Davis was lying, that Shirlayne George was lying, and that most importantly that Layne Morris is lying to you. Layne Morris is not a man who would lie. Look at his character. He has been a public servant. He has served this country and the citizens of West Valley City his entire life. You don't become a First Class Sergeant in the Green Berets unless you are a leader and a man of integrity. There is a movie out called 12 Strong. It's about one group of the first special forces responders that was sent to Afghanistan right after 9-11.

[Bird's counsel]: Your Honor, I'm going to object to improper vouching about the –

THE COURT: You may proceed.

[Defense counsel]: Thank you, Your Honor. Kelly Davis – I'm sorry, I got off here. Layne Morris was one of the first responders in the Green Berets to go out there as a special forces man to go to Afghanistan. Now, he is not as tall, doesn't have as much hair, and he is not as handsome as Chris Hemsworth who stars in that movie, but Layne Morris is the real deal. Did you see how emotional he got when I asked him about his oath to defend the Constitution? He knows by firsthand what it is to live and fight against a country, a leadership, a government, that doesn't have these constitutional rights. The Taliban. And he put his life on the line doing that. But now you're asked to find that he would violate Karen Bird's Constitutional rights and he would lie in a United States Courtroom about it. That is not what this case -- that is not why she was terminated.

Aplt. App. at 1475–76.

In her motion for new trial, Bird argued that defense counsel acted improperly by "rel[ying] on Morris' irrelevant military experiences in closing to suggest that Morris would not lie (and in doing so, improperly vouched for Morris' credibility)," and "falsely suggest[ing] that Morris was the subject of a new movie, and that his character was being played by a famous actor." *Id.* at 118.

The district court analyzed defense counsel's arguments at length and ultimately rejected Bird's motion. In doing so, the district court agreed that certain

18

of the arguments made by defense counsel were improper and, in some instances, constituted improper vouching or bolstering. But, after considering the three *Whittenburg* factors, the district court concluded that a new trial was not required. In particular, the district court noted that: (1) the improper remarks by defense counsel "were very brief, lasting less than two minutes during an almost hour-long closing argument," *id.* at 172; (2) it "instructed jurors both before and after trial that arguments of counsel [we]re not evidence" and "also gave copies of the final instructions to the jurors, allowing them to follow along while [it] read the instructions, and to take them into the jury room," *id.* at 175; and (3) "the verdict itself indicate[d] that the jury did not find . . . Morris fully, if at all, credible," *id.* at 176, and "Bird's counsel had an opportunity to address—and did in fact address—the remarks that . . . Defendants' counsel made concerning . . . Morris's credibility during her rebuttal argument," *id.* at 178.

In her appellate brief, Bird argues that all of the *Whittenburg* factors weigh in favor of a new trial. To begin with, Bird argues that defense counsel's remarks were not minor aberrations nor were they made in passing. Aplt. Br. at 35. In support of this argument, she argues that the "improper evidence . . . was introduced at length" during defense counsel's cross-examination of Morris. *Id.* But that is both incorrect and conflates the evidence itself with defense counsel's closing remarks. The evidence itself, although irrelevant, was relatively short when compared to the overall length of Morris's testimony on cross-examination. As for defense counsel's improper remarks during his closing argument, the district court found, and Bird does

19

not dispute, that they "were very brief, lasting less than two minutes during an almost hour-long closing argument." Aplt. App. at 172. Thus, we agree with the district court that this factor "weighs against the extreme remedy of a new trial." *Id.* at 174.

As for the second *Whittenburg* factor, Bird concedes that the district court specifically instructed the jury that "attorney argument is not evidence," but she argues that "the court did not specifically address the evidence or conduct at issue." Aplt. Br. at 36. Bird also argues that because the district court overruled her objections to defense counsel's questioning of Morris regarding his military history, the jury could have "reasonably believe[d] that . . . the fact that . . . Morris was wounded in war was relevant to their decision." *Id.* These arguments, however, are not persuasive. As the district court noted, it instructed the jury, both before and after the evidence was presented, that attorney arguments should not be considered as evidence. The longstanding presumption in federal court is "that juries follow the instructions given to them notwithstanding what has been said in court," and there is nothing unique about the case at hand that would suggest the jury did not do so. *Burke*, 935 F.3d at 1033 (quotations omitted). Although we indicated in *Whittenburg* that more specific instructions might be necessary if the offending remarks are extensive and the district court overruled a contemporaneous objection, in this case the remarks, as discussed above, were a very small part of defense counsel's closing arguments. 561 F.3d at 1132. Thus, we agree with the district court that its general instructions, combined with the brevity of the arguably improper remarks, helped

mitigate any prejudicial effect those comments may have had. As a result, this factor weighs against the grant of a new trial.

Lastly, Bird argues, with respect to the third *Whittenburg* factor, that "it is important that the person whose credibility was improperly bolstered and vouched for was the sole decision-maker from" the City and, "[a]s such, his credibility was of the utmost importance, and no one else's could have been determinative of the City's liability." Aplt. Br. at 38. Bird further argues that "[o]nly . . . Morris can say for sure" why he terminated her, "so his credibility and integrity is paramount," and "[t]his is what makes Defendants' improper evidence and arguments to bolster his credibility so damaging." *Id.* at 38–39.

As the district court noted, however, the jury chose not to believe all of Morris's testimony. Although Morris denied at trial that the leaking of information to the press about the failed euthanasia of the cat played any role in his decision to terminate Bird, the jury specifically found on its special verdict form that Bird had proven by a preponderance of the evidence that the City's belief that she leaked information to the press regarding the failed euthanasia of the cat *was* a substantial or motivating factor in the decision to terminate her employment. But the jury apparently believed other portions of Morris's testimony because it also found that the City had proven by a preponderance of the evidence that it would have terminated Bird's employment in the absence of any belief that she leaked information to the press regarding the unsuccessful euthanasia of the cat. On this latter point, Morris testified that he had considered terminating Bird's employment for approximately a

21

year, and the testimony of Davis and George bolstered Morris's testimony on this point by confirming that there were numerous issues that justified Bird's termination. Thus, we agree with the district court's conclusion that "any arguably improper attempts to bolster or vouch for [Morris's] credibility did not work, as the jury expressly disagreed with . . . Morris's statements about his motive," and the jury did not allow argument to drive its factual determinations concerning . . . Morris's credibility." Aplt. App. at 177.

For these reasons, we conclude the district court did not err in denying Morris's motion for new trial.

*Verdict form*

In her second issue on appeal, Bird argues that the language used by the district court in the verdict form was erroneous because it asked the jury, in part, whether Davis ordered "a mass execution at the [Shelter] in October 2011." *Id.* at 111. Notably, Bird concedes that this alleged error does not warrant a new trial. Aplt. Br. at 44. Instead, she states that "she wishes to avoid the same error if this Court orders a new trial," and she "therefore seeks a decision from this Court as to the correctness of the verdict form." *Id.* Because we have concluded that Bird is not entitled to a new trial, we need not address the merits of Bird's arguments regarding the verdict form.[1]

---

[1] We likewise find it unnecessary to address the three issues raised by defendants in their appellate response brief.

22

## IV

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge