**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 8, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KAREN BIRD,

      Plaintiff - Appellant,

v.

No. 15-4024

WEST VALLEY CITY, a political
subdivision of the State of Utah; KELLY
DAVIS, in his official and individual
capacities,

      Defendants - Appellees.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:12-CV-00903-PMW)**
_____

April L. Hollingsworth, Hollingsworth Law Office, Salt Lake City, Utah (Ashley F.
Leonard, with her on the briefs), Hollingsworth Law Office, LLC, Salt Lake City, Utah,
for Plaintiff-Appellant.

Stanley J. Preston (Bryan M. Scott, and Brandon T. Crowther, with him on the brief),
Preston & Scott, Salt Lake City, Utah, for Defendant-Appellee.

_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

In 2011, city officials of West Valley City, Utah, terminated Plaintiff Karen

Bird from her position as manager of the city's Animal Shelter. She now brings

various claims under Title VII, 42 U.S.C. § 1983, and Utah contract law against West Valley City and Kelly Davis, her immediate supervisor at the Animal Shelter. According to Plaintiff, both her termination and Mr. Davis's behavior during her time at the Animal Shelter were unlawful. The district court, with a magistrate judge presiding by consent of the parties, granted summary judgment to Defendants on all counts. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part for the following reasons.

## I. BACKGROUND

The following facts are either undisputed or taken in the light most favorable to Plaintiff. Plaintiff gained employment with Defendant West Valley City at its Animal Shelter in 2001 and worked there until city officials fired her in November 2011. Defendant Kelly Davis, the Director of Operations for West Valley City's Animal Services Division, promoted Plaintiff to manager of the Animal Shelter the year after she began working for the city. Mr. Davis directly supervised Plaintiff during her entire duration at the Animal Shelter.

During the latter half of Plaintiff's employment, the environment of the Animal Shelter was toxic. For a variety of reasons not relevant to this appeal, many different employees habitually provoked needless arguments, engaged in vicious confrontations, and hurled passive-aggressive remarks toward one another. The Animal Shelter, in other words, effectively functioned as a real-life soap opera. For this very reason, employees constantly complained to the West Valley City Human Resources Department about one another, and employee turnover at the Animal

2

Shelter was quite common.

Plaintiff was one of the biggest contributors to this tumultuous environment. For instance, Shirlayne George, who worked for West Valley City for nearly two decades as its Human Resources Manager, investigated the Animal Shelter in 2005 and quoted employees as making the following comments about Plaintiff:

- "We are all afraid to express an opinion or complain about something or make suggestions because if Karen does not like it we all pay. We just quit bringing issues up to keep peace."

- "[Karen] is degrading in her talk."

- "Nobody dares complain about anything. If Karen is in a bad mood we all pay."

- "I have seen Karen stomp her feet and clench her fist[s] when she gets mad to the point that her face gets all red. Like a 10 year old."

- "Everyone is scared of her. When she is in a bad mood you want to run and hide."

George Notes from 2005 Investigation of Animal Shelter 3–4.[1]

---

[1] This evidence is arguably hearsay, as is much of the other evidence in this case. Nonetheless, neither party objected in the district court to the admission of any evidence on the basis of hearsay, nor have they done so in this Court. In fact, both parties often rely on the same exact hearsay to make their arguments. Given the lack of any objections, we consider all relevant evidence in the record and do not disregard any evidence *sua sponte*. *See Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013) (considering evidence at the summary judgment stage that was arguably hearsay because there was "no reason to depart from the general rule that an evidentiary objection not raised in the district court is waived on appeal"); *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("Under our precedents, we are constrained to disregard . . . hearsay on summary judgment *when, as here, there is a proper objection to its use* and the proponent of the testimony can direct us to no applicable exception to the hearsay rule." (emphasis added)); Fed. R. Civ. P. 56(c)(2) ("*A party may object* that the material cited to

But Plaintiff was not the only culprit. Employees also frequently complained about Mr. Davis. Many of these employees, including Plaintiff, were female. Ms. George, for example, investigated Mr. Davis in October 2009. According to her investigation notes, female employees made the following comments about Mr. Davis:

- Mr. Davis was "always yelling, bullying, and slamming," led one meeting that "was so bad, all but [two] people left crying," and "has told the girls they think too much, they worry about their feelings too much."

- Mr. Davis "often slam[med] his fists on the chair or table" and "recognize[d] the guys but not the girls."

- Mr. Davis got so angry with one employee that he "stood up and got in her face" and came "so close [to her that] she thought he might hit her." She was so traumatized by the experience that she is "having nightmares and is seeing a therapist who has recommended that she see a crisis counselor."

- Plaintiff herself stated that Mr. Davis "is a 100% bully in the way he treats others," "treats women different than men because women complain more," and "thinks that some of the men don't work as hard but never get in trouble for it."

George Notes from 2009 Investigation of Davis 1–3, 5.

All in all, at least nine women (including Plaintiff) complained to West Valley City about how Mr. Davis had treated them during their time at the Animal Shelter. Plaintiff testified during her deposition that many of these employees had told her at one point or another that Mr. Davis "just treats them awful," "belittles them," and "is demeaning." Bird Dep. 217:18–19. Further, most of the women who complained

_____
support or dispute a fact cannot be presented in a form that would be admissible in evidence." (emphasis added)).

4

about Mr. Davis either were fired from their positions at the Animal Shelter after they complained about Mr. Davis or voluntarily left to avoid further mistreatment.

Ms. George herself was not exempt from Mr. Davis's treatment. She had her own difficulties with him and testified that she did not like him or his management style. She further noted that she had a tough time communicating and working with him because "it was hard for him, because of his personality, to take counsel from a woman." George Dep. 61:17–18. And as a result of the 2009 investigation into Mr. Davis, Ms. George concluded that Mr. Davis had a "serious anger management issue" that "interfer[ed] with his ability to be an effective manager." George Notes from 2009 Investigation of Davis at 7. Neither Ms. George nor any other West Valley City official, however, formally disciplined Mr. Davis for any of his conduct. The only remedial measure taken was that Layne Morris, the Community Preservation Department Director and Mr. Davis's direct supervisor, frequently counseled Mr. Davis about how to be a more effective manager.

But Ms. George also stated that she "watched how things were working at the shelter" and felt that a lot of the complaining was "just backbiting." George Dep. 35:17–18. She also believed that "it might have been harder for the women to understand [Mr. Davis's] management style" since he formerly had been a police officer, presumably implying that he was accustomed to working in a more gruff and aggressive environment. *Id.* at 45:3–4. In any case, she testified that "probably almost every employee of the shelter" had complained to her about Mr. Davis, and "[t]he complaints were the same across the board for men and women." *Id.* at 27:22–23,

5

56:21–22.

As if Plaintiff's and Mr. Davis's managerial styles were not bad enough on their own, they came to hate each other after they had a disagreement in 2009. The resulting power struggle between the two heavily affected employee morale—one employee even referred to their relationship as "the little war." George Typed Notes from 2011 Investigation of Animal Shelter 1–2. And over the next two years their mutual animosity crescendoed to such a point that Mr. Morris testified Plaintiff "could not stand to be in the same room with [Mr. Davis]," "couldn't look him in the eye," and "refused to answer his questions." Morris Dep. 76:10–12.

Incidentally, in October 2011—during the high point of the feud between Plaintiff and Mr. Davis—the Salt Lake Tribune published an article about a cat that had survived two euthanization attempts in the Animal Shelter's gas chamber. The backlash was immediate: upset citizens flooded the Animal Shelter with complaints about the way it handled and treated animals. A little over a week after this article appeared, the Animal Shelter received news that further negative press was on the way. A reporter called a West Valley City official and informed the official that he (the reporter) had received an anonymous telephone call alleging that Mr. Davis was ordering a mass execution of animals due to overpopulation. Both Mr. Davis and Mr. Morris were under the impression that Plaintiff, who was notoriously against using the gas chamber to euthanize animals and who was one of the few individuals privy to the meeting discussing the shelter's overpopulation, was the source of these leaks. Plaintiff, however, vehemently denied that she was the one who provided this

6

information to the press.

Around the same time as the anonymous phone call to the press, Plaintiff finally decided she had enough. She emailed Ms. George and stated she could not "take anymore of Kelly's belittling, bullying[,] and harassing me." Bird Email to George, Oct. 24, 2011. Shortly afterward on November 3, 2011, Plaintiff filed a formal complaint against Mr. Davis with the Human Resources Department of West Valley City.[2] Although the complaint outlines various instances where Mr. Davis harassed and demeaned Plaintiff, she did not allege gender discrimination or otherwise suggest that her gender motivated Mr. Davis's abuse.

Less than a week after Plaintiff filed this formal complaint, Mr. Davis issued her two letters of reprimand, both of which concerned Plaintiff's unauthorized collection of overtime pay during the previous month. According to West Valley City's Policy and Procedures Handbook, letters of reprimand are formal disciplinary actions that are "placed in the employee's personnel file in the Human Resource Office." Policy & Procedures Handbook § 9.3(C)(II). Plaintiff, however, had never before been formally disciplined in her decade-long career at the Animal Shelter. Further, Mr. Davis testified that he generally gave employees informal "correct deficiency forms" before resorting to the more formal letters of reprimand. Mr. Davis nonetheless issued the two letters of reprimand to Plaintiff without first giving her any correct deficiency forms.

---

[2] The complaint itself is dated November 2, 2011, but both parties agree that Plaintiff actually submitted the complaint to Ms. George on November 3.

In response to Plaintiff's complaint against Mr. Davis, Ms. George undertook an investigation of the *entire* Animal Shelter on November 14, 2011. Even though Plaintiff's complaint had been against Mr. Davis alone, Ms. George testified that she "felt like there were so many issues out there between all of the employees that the investigation that [she] was going to do had to be very broad so that [she] could get a really good idea of what was going on at the shelter." George Dep. 60:24–61:3.

The results of this investigation indicated employees had mixed feelings about Mr. Davis. Although some employees noted that "[h]e is gruff in his speaking," "uses inappropriate language when disciplining," and "belittles Karen in front of others," others observed that "his temper has subsided immensely in the last two years" and that he carefully listens to employees' suggestions. George Typed Notes from 2011 Investigation of Animal Shelter 4.

The comments about Plaintiff, on the other hand, were much more negative and expansive. The following are select excerpts from Ms. George's notes summarizing comments that employees made to her about Plaintiff:

- "Karen has belittled me in front of others for the tiniest of mistakes."

- "She was heard telling her employees not to work with [West Valley City] officers yet she expected the officers to help her out when she needs it."

- "One employee mentioned Karen . . . talking bad about [Mr. Davis] in front of the staff while waiting for him to show up for roll call. It was inappropriate and uncomfortable."

- "We were told by [another employee] that animals were not allowed in the lobby of the shelter. Kelly has tried to reinforce this but Karen . . . take[s] them in 'just to piss Kelly off.'"

- "I think the communication problem between Kelly and Karen stems from the fact that she gives him no input, does not support him, and does not make an attempt to communicate."

- "Feels that Karen treats the women better than the men."

- "Karen's attitude seems to be gender related, the general consensus in the shelter is that she does not like men and therefore treats them differently."

*Id.* at 1–2. Ms. George even observed that there were "more derogatory things said about Karen than Kelly." George Dep. 63:13.

Mr. Morris reviewed the results of this investigation and decided that Plaintiff, not Mr. Davis, needed to be disciplined. As such, he sent Plaintiff a letter on November 16 informing her that she faced "disciplinary action up to and including termination of employment" and that she had a right to a pre-disciplinary meeting to discuss the allegations against her. Morris Letter to Bird 1, Nov. 16, 2011. According to the letter, these allegations included "insubordination" and "failure to be courteous or cooperative with the public or fellow employees."[3] *Id.* at 1–2. After holding the pre-disciplinary meeting, Mr. Morris determined that these allegations were justified and decided to terminate Plaintiff's employment effective November 29, 2011.[4] In accordance with that decision, he sent her another letter on December

---

[3] Mr. Morris also informed Plaintiff that she was charged with misconduct, using official authority to influence or coerce any political action, and neglect or refusal to perform a duty or responsibility. After holding Plaintiff's pre-disciplinary meeting, however, Mr. Morris specifically determined that Plaintiff was not in violation of any of these other three charges.

[4] Mr. Morris filed an affidavit wherein he stated the decision to terminate Plaintiff was his alone and "Mr. Davis did not terminate Karen Bird, nor did he participate in the decision to terminate her." Aff. of Layne Morris 2, May 29, 2014.

9

and informed her that "[a]s per the voicemail I left you on November 29, 2011, it is my decision to terminate your employment with West Valley City due to insubordination and failure to be courteous or cooperative with the public or fellow employees." Morris Letter to Bird 1, Dec. 12, 2011.

Mr. Morris's decision to discipline and ultimately terminate Plaintiff was not based on the results of Ms. George's investigation alone. He testified that he had watched the relationship between Plaintiff and Mr. Davis deteriorate over the years and primarily based his decision to fire Plaintiff on his numerous observations of these two individuals. In fact, Mr. Morris had even considered firing Plaintiff as early as December 2010—a full year before her actual termination—but testified that *Mr. Davis* had stayed his hand to give her a final opportunity to redeem herself. Ms. George's latest investigation was simply the final straw.

Specifically, Mr. Morris testified that over the years Plaintiff had frequently displayed "all kinds of" insubordination toward Mr. Davis, which mainly stemmed from Plaintiff's "role as the Shelter Manager and what [Mr. Davis] wanted her to focus on . . . versus what she wanted to focus on." Morris Dep. 51:6, 51:10–12. He described, for instance, how Plaintiff did not agree with or willingly implement the cleaning schedule that Mr. Davis created for the Animal Shelter because she wanted to prioritize medicating and caring for the animals. According to Mr. Morris,

_____

Although the parties dispute how much influence Mr. Davis had on Mr. Morris's decision, both parties agree that Mr. Morris was the person who actually terminated Plaintiff.

10

insubordination such as this occurred on an "ongoing basis," and it eventually became so pervasive and inappropriate that Plaintiff "simply refused to obey or even frankly acknowledge the chain of command." *Id.* at 50:7–8, 50:25. This insubordination—that is, Plaintiff's eventual unwillingness to even *work* with Mr. Davis—was the main reason he terminated Plaintiff. But he also testified that Plaintiff's failure to be courteous with her fellow employees factored into his decision. For example, he described various instances in which "multiple people" had complained Plaintiff had been "very unfair" and "very rude" to a male shelter technician. *Id.* at 85:20–23. He also noted that Plaintiff would go "out of her way to badger and to belittle" other Animal Shelter employees who utilized or wanted to utilize the euthanasia chamber to put down animals. *Id.* at 86:4–5. Given Plaintiff's nature as a difficult employee to manage, her unwillingness to even engage with Mr. Davis, and her rude and unprofessional demeanor, Mr. Morris felt that termination was proper.

Plaintiff unsuccessfully appealed her termination to Ms. George. She next appealed her termination to Paul Isaac—West Valley City's Human Resources Director, Assistant City Manager, and Ms. George's direct supervisor—who also upheld the termination. Finally, Plaintiff appealed her termination to the West Valley City Employee Appeals Board, and after a full hearing on the matter, it too upheld her termination. Plaintiff never alleged she was a victim of gender discrimination in any of these appeals.

Plaintiff thereafter filed this lawsuit in the district court against West Valley

11

City and Mr. Davis. She alleged that West Valley City violated Title VII because it terminated her as a result of gender discrimination and subjected her to a hostile work environment; that West Valley City violated 42 U.S.C. § 1983 because, in violation of the Equal Protection Clause, it terminated her as a result of gender discrimination; and that both West Valley City and Mr. Davis violated 42 U.S.C. § 1983 because they terminated her in retaliation for engaging in her First Amendment free speech rights. Her First Amendment retaliation claim centered around the anonymous statements leaked to the press about the cat that survived the euthanasia attempt and the planned mass-execution of the animals at the Animal Shelter. Plaintiff still insisted she did *not* make these statements. But she also claimed that West Valley City and Mr. Davis *believed* she was the source of the leaks. And because she maintained West Valley City and Mr. Davis may have fired her based on this belief, she argued the City and Mr. Davis violated her First Amendment rights.

Additionally, Plaintiff brought claims under Utah state law against West Valley City for breach of contract and breach of the covenant of good faith and fair dealing. She alleged two distinct bases for these claims. First, she pointed to a written provision in the Policy and Procedures Handbook, which Plaintiff first received a copy of in January 2002, entitled "Workplace Violence Policy." This provision states that West Valley City will not tolerate workplace violence and requires the City to respond to and investigate all reports of violence, including "verbal or physical harassment, verbal or physical threats, assaults or other behavior that causes others to feel unsafe, (e.g., bullying, sexual harassment)." Policy & Procedures

12

Handbook § 14.2. Second, she argued that Mr. Davis, Ms. George, and Mr. Isaac all strongly emphasized West Valley City's unwritten anti-retaliation policy, which prohibits the City from retaliating against employees who make complaints of any kind. Plaintiff contended that these written and unwritten policies constituted implied-in-fact contracts between West Valley City and herself and argued that West Valley City breached these contractual provisions by allowing Mr. Davis's abusive conduct toward her and terminating her for complaining about Mr. Davis. She also contended that West Valley City breached its covenants of good faith and fair dealing that inherently existed because of these implied-in-fact contracts.[5]

The district court granted summary judgment to Defendants on all claims. The court concluded Plaintiff's Title VII claims must fail because she could not raise a genuine issue of material fact that her termination was merely pretext for gender discrimination or that any abuse she suffered, however severe and unbearable, resulted because of her gender. The court likewise concluded Plaintiff's § 1983 claim for gender discrimination must fail because she could not establish that she had ever been intentionally discriminated against because of her gender. Regarding her First Amendment retaliation claim under § 1983, the district court concluded Plaintiff could not establish that she had engaged in any constitutionally protected speech

---

[5] Plaintiff also brought a claim against Mr. Davis in his individual capacity under 42 U.S.C. § 1983 based on her belief that he deprived her of her procedural and substantive due process rights when she was terminated. Plaintiff conceded in the district court, however, "that her . . . pending due process claim should be dismissed." Mem. Decision & Order 18, Feb. 3, 2015.

13

since she had continually denied her involvement in any leaks to the press. Because at the time of the district court's decision a plaintiff had to first show she engaged in some constitutionally protected activity before she could recover under a First Amendment retaliation claim, the district court granted judgment to Defendants as a matter of law. Finally, the district court denied Plaintiff's contractual claims based on a provision in the Policy and Procedures Handbook entitled "Policies and Procedures Do Not Constitute a Contract." This provision states:

> The information contained in this handbook was prepared to give employees a better understanding of the responsibilities and obligations of employment with the City. This handbook contains information about City policies and procedures. *The policies and procedures stated in this handbook and in other personnel statements or materials issued by the City do not create a binding contract, agreement, or other obligation or liability on the part of the City.*

Policy & Procedures Handbook § 1.2(A) (emphasis added). The district court concluded this disclaimer covered both the written Workplace Violence Policy and unwritten anti-retaliation policy and thus precluded West Valley City from any contractual liability.

Plaintiff now appeals from the district court's grant of summary judgment.

## II.    STANDARD OF REVIEW

"We review de novo a district court's grant of summary judgment" and "must view the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Emcasco Ins. Co. v. CE Design, Ltd.*, 784 F.3d 1371, 1378 (10th Cir. 2015) (internal quotation marks omitted). "We will uphold the district court's grant of summary judgment only if

14

'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).  A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Importantly, in opposing a motion for summary judgment, the non-moving party "cannot rest on ignorance of facts, on speculation, or on suspicion." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

Regarding Plaintiff's state-law claims, "we review the district court's interpretation and determination of state law de novo." *ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 494 F.3d 1238, 1243 (10th Cir. 2007).  "Where the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Id.* (internal quotation marks omitted).

## III.   TITLE VII

Plaintiff brings two claims under Title VII against West Valley City alone.  She first argues that West Valley City terminated her because of her gender, consistent with a larger pattern and practice in which it terminated women who complained about Mr. Davis's behavior or did nothing as these women voluntarily quit to avoid experiencing further mistreatment from him.  She also argues that West Valley City subjected her to a hostile work environment on the basis of her gender.  We proceed to each of her claims in turn.

15

## A. *Gender Discrimination*

Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Plaintiff acknowledges she has provided only indirect circumstantial evidence that West Valley City engaged in this prohibited conduct. We thus employ "the three-part burden-shifting framework" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), to determine whether West Valley City terminated her because of her sex.[6] *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1220 (10th Cir. 2007); *see Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). Under this framework, Plaintiff must first establish a prima facie case showing that West Valley City terminated her because of her gender. *Etsitty*, 502 F.3d at 1220. The burden of production then shifts to West Valley City "to articulate a legitimate, nondiscriminatory reason for the adverse action." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). Finally, if West Valley City satisfies this burden, "then summary judgment is warranted unless [Plaintiff] can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual."

---

[6] Plaintiff does not argue on appeal, nor did she argue in the district court, that West Valley City officials had "mixed motives" when firing her, and she thus does not contend that illegal gender discrimination "played [only] a 'motivating part' in the employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), *superseded in part by* 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B)). For this reason, we utilize the *McDonnell Douglas* burden-shifting framework alone in analyzing her attempt to prove illegal gender discrimination. *See id.* (explaining that courts do not employ the *McDonnell Douglas* framework when analyzing mixed-motives claims).

*Plotke*, 405 F.3d at 1099.

A plaintiff must make only a "*de minimis* showing" to establish a prima facie case of gender discrimination under the *McDonnell Douglas* framework. *Id.* at 1102. Generally, this standard is flexible, and "the articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged." *Id.* But a common element critical to all prima facie cases is that the plaintiff must demonstrate that "the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* at 1100 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000)).

Plaintiff does not suggest that the circumstances giving rise to an inference of gender discrimination stem from any instance where Mr. Davis—or anyone else employed by West Valley City, for that matter—made a specific gender-based remark or took a specific gender-based action toward *her*. Instead, she alleges West Valley City had a "pattern and practice" of discriminating against female employees by ignoring female employees' complaints against a male employee, i.e., Mr. Davis; allowing Mr. Davis to continue acting in an abusive and demeaning manner toward his female employees; and terminating the women who complained about Mr. Davis or forcing them to quit. Because she was fired within a month after complaining about Mr. Davis and was put under investigation herself as a result of this complaint, she claims the circumstances suggest West Valley City acted pursuant to this pattern and therefore give rise to an inference of unlawful discrimination.

17

We assume without deciding that Plaintiff can establish that West Valley City engaged in this pattern and practice she describes. And given that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), we likewise assume without deciding that Plaintiff, based on this pattern and practice, has established a prima facie case showing that she was terminated because she is a woman.

Further, Layne Morris, the sole individual responsible for firing Plaintiff, articulated in his deposition at least two legitimate, nondiscriminatory reasons for her termination. *See Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997) ("This burden is exceedingly light; the defendant must merely proffer non-gender based reasons, not prove them." (internal quotation marks omitted)). He testified that the main reason he terminated Plaintiff was because of the insubordination she displayed to Kelly Davis. He also felt her termination was justified based on her failure to be courteous and cooperative with fellow employees. Both of these reasons are listed as grounds for discipline in West Valley City's Policies and Procedures Handbook.

The burden thus shifts back to Plaintiff to establish a genuine issue of material fact that these reasons were pretextual. In so doing, Plaintiff must show that West Valley City's "proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *Conroy v. Vilsack*, 707 F.3d 1163, 1172 (10th Cir. 2013) (alteration in original) (internal quotation marks omitted). But in

18

assessing West Valley City's explanations for Plaintiff's termination, "we examine the facts as they appear *to the person making the decision.*" *Id.* at 1174 (emphasis in original) (internal quotation marks omitted). "[W]e do not ask whether the employer's proffered reasons were wise, fair or correct; we ask only whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (second alteration in original) (internal quotation marks omitted).

Plaintiff uses several different arguments in her attempt to establish that a genuine dispute of material fact exists as to whether West Valley City's reasons for terminating her—insubordination and failure to be courteous or cooperative with fellow employees—were pretextual. First, she contends that the reasons Mr. Morris outlined in his deposition for terminating Plaintiff differ from the reasons he outlined at the time of her termination. Indeed, if Plaintiff were correct, that would allow her Title VII gender discrimination claim to survive summary judgment. We have previously held that a genuine factual dispute regarding pretext can arise when an employer changes its explanation for an employment decision "after significant legal proceedings have occurred." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005). But in his deposition Mr. Morris did not change the *reasons* he gave for terminating Plaintiff. He has steadfastly affirmed from the time of Plaintiff's termination that he fired her because of her insubordination toward Mr. Davis and discourtesy toward her fellow employees. Instead, in his testimony, Mr. Morris merely offered *specific examples* of this insubordination and discourtesy.

19

For instance, in the November 16, 2011 memorandum that Mr. Morris sent to Plaintiff informing her of her right to a pre-disciplinary meeting—the first instance in the record where Mr. Morris notified Plaintiff she faced "disciplinary action up to and including termination of employment"—Mr. Morris told Plaintiff that she faced charges of both insubordination and failure to be courteous or cooperative with the public or fellow employees. In support of these allegations, he told Plaintiff that the charge of insubordination arose because she had "consistently . . . argu[ed] with [Mr. Davis] over various issues in front of [her] staff" and that the charge of failure to be courteous or cooperative with the public or fellow employees arose because the City had "received several complaints about [her] aggressive and abrasive behavior toward [her] employees." Morris Letter to Bird 2, Nov. 16, 2011. Of course, none of these remarks contradict anything that Mr. Morris testified about in his deposition. Rather, they coincide perfectly with his testimony, where Mr. Morris simply laid out different instances—such as Plaintiff's willful failure to implement the cleaning schedule and her tendency to demean employees who utilized the euthanasia chamber to put down animals—where Plaintiff had been both insubordinate and discourteous.

Further, in the December 12, 2011 termination letter that Mr. Morris sent to Plaintiff, Mr. Morris informed Plaintiff that he was choosing to terminate her employment "due to insubordination and failure to be courteous or cooperative with the public or fellow employees." Again, he mentioned these same reasons in Plaintiff's appeal before the West Valley City Employee Appeals Board. And when asked during that same appeal to give a specific example of Mr. Davis's and Plaintiff's interactions,

20

Mr. Morris stated, "You could have them in the same room and . . . Karen would be unable to even look at Kelly or respond to anything that he said."  Tr. of Employee Appeals Board Hr'g 328:13–14.  This example *is the exact same example* that he gave during his deposition.  Once more, the congruence between Mr. Morris's pre-litigation statements and post-litigation statements is apparent.

And contrary to Plaintiff's arguments, no other West Valley City official or entity involved in Plaintiff's termination process changed his or her reasons for her termination or otherwise "offer[ed] inconsistent reasons for [his or her] decision."  *Conroy*, 707 F.3d at 1174.  Ms. George, Mr. Isaac, and the West Valley City Employee Appeals Board *all* determined in their respective appeals that Plaintiff's termination was justified because she was insubordinate and discourteous to her fellow employees.[7]  Granted, they sometimes gave unique examples of Plaintiff's insubordination and discourtesy—Ms. George, for instance, referred to "one particular instance [where Plaintiff] did not provide Kelly Davis a supply list in the form that he had requested be used for such a list," George Letter to Bird 2, Dec. 15, 2011—but these differing examples are hardly surprising.  As Mr. Morris stated in the November 16 letter:

> While there are specific allegations that led to this potential termination from employment, *it is based on your numerous incidents [and] problems . . .* over the past several years.  *You have a history of*

---

[7] Unlike Mr. Morris, all three of these individuals or entities also determined that Plaintiff violated a third charge: neglect or refusal to perform a duty or responsibility.  Plaintiff does not allege on appeal that these additional determinations are evidence of pretext in any way, so we do not address why Ms. George, Mr. Isaac, or the Employee Appeals Board believed Plaintiff violated this third charge.

> *insubordination* and being subversive to your immediate supervisor at the Animal Shelter. *Your record as a whole* indicates that you may not possess the necessary demeanor to perform the functions of the West Valley City Animal Shelter Manager in a competent manner.

Morris Memorandum to Bird 2, Nov. 16, 2011 (emphases added). We agree that the record overwhelmingly describes numerous examples of Plaintiff's insubordination to Mr. Davis and general discourtesy to her fellow employees. As far back as 2005 and up until the time of her termination, multiple different employees complained about the way Plaintiff treated others and acted at the Animal Shelter. They claimed that she was "degrading in her talk," "belittled [employees] in front of others for the tiniest of mistakes," and "treat[ed] the women better than the men." Mr. Morris himself even testified that Plaintiff would go "out of her way to badger and to belittle" other Animal Shelter employees. But more importantly, Plaintiff would intentionally try to "piss [Mr. Davis] off," constantly battled his demands—whether it was implementing a cleaning schedule, providing him lists in the form he wanted them, not bringing animals into the Animal Shelter's lobby, not taking overtime pay without his prior approval, or any one of the numerous other examples in the record—and eventually refused to even engage with him. Although any one of these individual instances in its own right may not have warranted any formal disciplinary action, their cumulative effect forces us to conclude (and would force any reasonable jury to conclude) that Plaintiff had a habit of being both insubordinate and discourteous. That West Valley City officials described different examples at different times of Plaintiff's repeated workplace failures is thus not only inconsequential for Title VII purposes but also to be expected given the extent of

22

Plaintiff's inappropriate work-place behavior. As such, Plaintiff has failed to demonstrate pretext based on her contention that West Valley City officials provided varying and contradictory reasons for her termination.

Plaintiff also attempts to point out "disturbing procedural irregularities" in the process that was used to discipline her in her effort to establish that West Valley City's alleged reasons for firing her were pretextual. Such irregularities can be sufficient to call into question the employer's honesty and good faith in making the termination decision and, consequently, establish pretext. *See, e.g.*, *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984). Specifically, Plaintiff notes that she received two letters of reprimand from Mr. Davis within a week after she filed her formal complaint against him but that, in so doing, nobody at West Valley City followed the usual process of first giving her a correct deficiency form before resorting to the letters of reprimand. She maintains that this circumstance alone shows there is a genuine dispute over whether West Valley City's reasons for terminating her were pretextual.

Plaintiff, however, does not argue or otherwise establish how these letters of reprimand, which concerned Plaintiff's unauthorized collection of overtime pay, were part of her termination process. This lack of analysis dooms her procedural-irregularity argument. Even assuming it was atypical for an employee to receive letters of reprimand without having first received a correct deficiency form, Plaintiff's failure to develop the connection between this anomaly and her termination, which was a separate disciplinary proceeding, means that this alleged

23

procedural irregularity is insufficient to establish pretext.

Finally, Plaintiff bemoans that she was investigated alongside Mr. Davis despite being the person who filed the complaint and that she, not Mr. Davis, was the one who was ultimately disciplined within a month after filing that complaint. She suggests that this creates "a dispute of fact over motivation that precludes summary judgment." Appellant's Br. 46 (citing *Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012)). Indeed, we have held that the "timing and sequence of events leading up to [an employee's] firing are . . . evidence of pretext." *Plotke*, 405 F.3d at 1105.

But the sequence of events leading up to Plaintiff's termination must be viewed in light of the extensive and well-documented issues in the record between Plaintiff and Mr. Davis. They had been at each other's throats for two straight years and treated one another unprofessionally and often viciously. For this reason, Ms. George unsurprisingly investigated both Plaintiff and Mr. Davis. She had to discover whether Plaintiff's complaint had merit or whether it was just another ploy that was meant to harm Mr. Davis. Similarly, Mr. Morris's decision to terminate Plaintiff was based on his numerous observations of Plaintiff and Mr. Davis. And when he received the results of Ms. George's investigation that indicated there were "more derogatory things said about Karen than Kelly," he determined, in accordance with his desire from the previous year, to terminate Plaintiff. No reasonable juror, when looking at the factual record as a whole, could conclude from the sequence of events surrounding Plaintiff's investigation and termination that West Valley City's

24

proffered explanations for firing her were pretextual.

Further, even though the timing leading up to an employee's termination is *evidence* of pretext, *Plotke*, 405 F.3d at 1105, it is not sufficient standing alone to *establish* pretext. Our cases regarding Title VII retaliation claims make this point clear. *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013) ("[C]lose temporal proximity can support a finding of pretext only in combination with other evidence of pretext."); *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) ("Although we may consider evidence of temporal proximity . . . in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." (citations omitted)); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) ("[W]e have stated that close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment."). And if temporal proximity alone cannot establish pretext for Title VII retaliation claims—the whole point of which are to prevent "employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013)—then surely it cannot suffice for Title VII gender discrimination claims. Indeed, in a retaliation claim, the temporal proximity between an employee's complaint of unlawful discrimination and his or her discharge is at least theoretically useful to show that the employer's reasons for terminating the employee are unworthy of belief. But in a gender discrimination claim, this same temporal proximity, although still useful, is certainly not *more* useful to raise a

25

genuine factual dispute about the veracity of the employer's stated reasons. This is especially true where, as here, the employee did not allege in the complaint she made to her employer that she had been discriminated against because of her gender.

In the end, therefore, Plaintiff's termination less than one month after she complained about Mr. Davis is *relevant* to her attempt to show that West Valley City's reasons for firing her were pretextual, but it is not *sufficient* to establish that pretext. And because Plaintiff has not otherwise made any convincing arguments that would lead us to believe West Valley City's explanations for terminating her "are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief," *Conroy*, 707 F.3d at 1172, we must conclude that West Valley City discharged Plaintiff because she was a difficult employee to manage, treated her direct supervisor (Mr. Davis) with disdain, refused to follow his directions, and sowed discord and anxiety at the Animal Shelter. We affirm the district court's grant of summary judgment to Defendants on Plaintiff's Title VII gender discrimination claim.

## B. *Hostile Work Environment*

Plaintiff's inability to establish that West Valley City terminated her because of her gender does not necessarily mean that Mr. Davis's alleged conduct at the Animal Shelter was somehow justified. Title VII also makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has

26

held that this language "is not limited to 'economic' or 'tangible' discrimination," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), but instead is broad enough to protect individuals from "work[ing] in a discriminatorily hostile or abusive environment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To prevail on her hostile work environment claim under Title VII, Plaintiff must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). "But severity and pervasiveness are not enough." *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005). Plaintiff must demonstrate "severe and pervasive harassment *based on gender*." *Id.* (emphasis added).

Taking the evidence in the light most favorable to Plaintiff, there exists a genuine factual dispute on the question whether Mr. Davis's conduct was so severe and pervasive to create an abusive working environment. Many different employees complained over the years of his aggressive and bullying behavior, and if this behavior—e.g., leading meetings where all but two people left crying, slamming his fists on chairs and tables, and treating employees so poorly that they had to see therapists—is true, then Plaintiff may be able to prove to a jury that Mr. Davis bullied her or others in such a way that it changed the conditions of her employment at the Animal Shelter. *See O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (holding that the severity and pervasiveness evaluation "is

particularly unsuited for summary judgment" because it "is quintessentially a question of fact").

But can Plaintiff raise a genuine factual issue that Mr. Davis's abuse was gender-based? On its face, most of Mr. Davis's alleged conduct, although despicable, was gender-neutral. This circumstance alone would seem to end the inquiry given that "a few isolated incidents" of gender-based abuse generally cannot establish a Title VII hostile work environment claim. *Chavez*, 397 F.3d at 832 (internal quotation marks omitted). Nevertheless, it merely pins her claim against the ropes instead of delivering the knockout punch. We have held that "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, *overtly gender-discriminatory conduct*." *O'Shea*, 185 F.3d at 1097 (emphasis added); *see also Chavez*, 397 F.3d at 833 ("The question then becomes whether [p]laintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment. Our precedents say that they can."). As a result,

> when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view all of the allegedly harassing conduct . . . as the product of sex and gender hostility," then "it is for the fact finder to decide whether such an inference should be drawn."

*Chavez*, 397 F.3d at 833 (quoting *O'Shea*, 185 F.3d at 1097, 1102).

Plaintiff directs us to only the following evidence to establish that Mr. Davis's alleged abusive conduct was based on gender: (1) Ms. George testified that "it was

28

hard for [Mr. Davis], because of his personality, to take counsel from a woman";
(2) several different female employees complained that Mr. Davis treated women differently than men (e.g., one employee claimed he "recognize[d] the guys but not the girls," and Plaintiff herself claimed "that some of the men don't work as hard but never get in trouble for it"); (3) most of the women who complained about Mr. Davis noted his furious temper, whereas the men who complained about Mr. Davis tended to downplay his behavior and disposition; and (4) one female employee alleged that Mr. Davis "has told the girls they think too much, they worry about their feelings too much."[8]  Taken individually and together, this evidence is insufficient to sustain a hostile work environment claim.

The first three pieces of evidence, although arguably overtly gender-based, offer only vague and conclusory generalizations rather than specific examples of gender-based conduct.  In particular, the first example attempts to explain Ms. George's perceptions of Mr. Davis's perceptions of women who advised him.  It describes no specific instance in which Mr. Davis accepted or rejected counsel from anyone, let alone in a gender-differential manner.  Second, the claim that Mr. Davis "recognize[d] the guys but not the girls" lacks any context or specifics.  Similarly, Plaintiff's assertion that "some of the men don't work as hard but never get in trouble

---

[8] To the extent other evidence exists in the record that could show Mr. Davis's alleged abuse may have been based on gender, Plaintiff does not raise or otherwise use it in her attempt to prove her hostile work environment claim.  Because we are not in the business of creating arguments for the parties before us when they have not done so themselves, we do not consider any of this other evidence when analyzing whether Mr. Davis's alleged abuse stemmed from gender animosity.

29

for it" provides no indication as to who got in trouble, for what, or in what way. The third piece of evidence—that women complainants noted Mr. Davis's temper while men downplayed it—is vague and lacks any examples of how he may have treated men and women differently. As to each of the foregoing, such conclusory statements unsupported by any examples are insufficient to create a general issue of fact. *See In re Grandote Country Club Co.*, 252 F.3d 1146, 1149–50 (10th Cir. 2001) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact. . . . To withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." (citations and internal quotation marks omitted)).

The fourth piece of evidence—that Mr. Davis "has told the girls they think too much" and "worry about their feelings too much"—is undeniably overtly gender discriminatory. But even assuming that Mr. Davis made this statement multiple times (as the phrase "*has* told the girls" could be understood to suggest), Plaintiff offers no evidence she knew Mr. Davis made such a statement until she conducted discovery for this action. This is problematic: "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21–22; *see also Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) ("[W]e consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." (internal quotation marks omitted)). Without evidence indicating Plaintiff

30

was aware of Mr. Davis's statements before the litigation, she cannot use them to demonstrate her subjective perception of an abusive environment based on gender.

Plaintiff's attempt to prove Mr. Davis's gender-based hostility therefore fails. We affirm the district court's grant of summary judgment to Defendants on Plaintiff's Title VII hostile work environment claim.

## IV.    42 U.S.C. § 1983 — EQUAL PROTECTION

Plaintiff also brings a claim under 42 U.S.C. § 1983 against West Valley City for violating the Equal Protection Clause of the Fourteenth Amendment. Like her Title VII gender discrimination claim, she argues that West Valley City had a discriminatory policy or custom of ignoring female employees' complaints against Mr. Davis, allowing him to continue his abuse, and terminating the women who complained about him or forcing them to quit. *See Notari v. Denver Water Dep't*, 971 F.2d 585, 587 (10th Cir. 1992) (holding that a plaintiff may bring both a § 1983 claim and a Title VII claim "even if the claims arise from the same factual allegations" "as long as the substantive legal bases for the claims are distinct"). She alleges West Valley City officials were acting pursuant to this unconstitutional policy or custom when they ignored her complaints of Mr. Davis's abuse and subsequently terminated her. She thus contends West Valley City deprived her of her equal protection as a woman under the law upon her termination.

Section 1983 mandates that "[every] person who acts under color of state law to deprive another of constitutional rights shall be liable in a suit for damages." *Moss v. Kopp*, 559 F.3d 1155, 1162 (10th Cir. 2009) (alteration in original) (internal

31

quotation marks omitted).  Under this section, a "person" is not limited to a human being.  Rather, "municipalities and other local government units [are] included among those persons to whom § 1983 applies."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  A local government, however, cannot be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* at 691 (emphasis in original).  Instead, a local government is liable only when "the unconstitutional actions of an employee were *representative of an official policy or custom* of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action."  *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (emphasis added).

An important caveat to any § 1983 claim is that "the plaintiff must still prove a violation of [an] underlying constitutional right."  *Daniels v. Williams*, 474 U.S. 327, 330 (1986).  This is because § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  And because Plaintiff is asserting an Equal Protection claim against West Valley City, this means a specific officer or officers of West Valley City had to *intentionally* discriminate against Plaintiff because of her gender

32

before she can attribute any fault to West Valley City as a whole.[9]  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (holding that "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) (noting that purposeful discrimination is "the state of mind required to establish an equal protection violation"); *Lewis v. City of Ft. Collins*, 903 F.2d 752, 755 n.1 (10th Cir. 1990) ("[P]urposeful discrimination is an essential element of an equal protection violation.").

But Plaintiff cannot raise a genuine issue of material fact that *anybody* at the Animal Shelter intentionally discriminated against her because of her gender.  The only facts she raises in support of an Equal Protection violation are the same facts she raises in support of her Title VII claims.  *See* Appellant's Br. 43 ("[Plaintiff] can show she was subject to gender discrimination under § 1983 for the same

---

[9] Plaintiff disputes this and contends that as long as "the [government] action was taken with deliberate indifference to its known or obvious consequences," then a plaintiff meets the state of mind requirement of a § 1983 claim.  Appellant's Br. 43 (alteration in original) (quoting *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 759 (10th Cir. 2014)) (internal quotation marks omitted).  But the "deliberate indifference" standard refers *only* to the level of culpability that is sometimes required to hold a municipality liable under § 1983.  *See, e.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  It does not refer to the state of mind required to prove the underlying constitutional violation that *gives rise* to the § 1983 claim against the municipality. *See, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). In other words, Plaintiff is collapsing two distinct analyses: (1) the state of mind required to prove the underlying Equal Protection violation, and (2) the level of culpability required to impose § 1983 liability against West Valley City once she has established this Equal Protection violation. The former requires intentionality and cannot be satisfied by deliberate indifference.

reasons . . . that [she] was subject to discrimination in violation of Title VII."). As we stated in our analyses of her Title VII claims, Plaintiff provides only indirect circumstantial evidence that West Valley City officials intentionally discriminated against her on the basis of gender and therefore must resort to the *McDonnell Douglas* framework to establish any intentional discrimination. *See Notari*, 971 F.2d at 589 (10th Cir. 1992) (explaining that the *McDonnell Douglas* framework is a mechanism that, if satisfied, establishes intentional discrimination as the most likely reason for the challenged employment decision). And indeed, the *McDonnell Douglas* framework can also be used to prove intentional discrimination under § 1983. *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1007–08 (10th Cir. 2001). Nonetheless, Plaintiff's attempt at utilizing *McDonnell Douglas* will fail under § 1983 for the same reason it failed under Title VII: West Valley City's stated reasons for firing her—insubordination and failure to be courteous or cooperative with her fellow employees—were not pretextual. As a consequence, it is unnecessary for us to decide whether West Valley City engaged in the policy or custom that Plaintiff describes. Because she cannot establish that she was a victim of intentional gender discrimination, Plaintiff has no underlying constitutional violation on which she can rely to impose municipal liability against West Valley City under § 1983. We thus affirm the district court's grant of summary judgment in favor of Defendants on Plaintiff's § 1983 Equal Protection claim.

## V.    CONTRACT CLAIMS

Plaintiff next brings claims against West Valley City under Utah law for

34

breach of contract and breach of the covenant of good faith and fair dealing. As in the district court, she bases these claims on (1) the "Workplace Violence Policy" in West Valley City's Policies and Procedures Handbook, and (2) the unwritten anti-retaliation policy.

The problem Plaintiff faces is that the contractual disclaimer in the Handbook specifically declares that "[t]he policies and procedures stated in this handbook and in other personnel statements or materials issued by the City do not create a binding contract, agreement, or other obligation or liability on the part of the City." Policy & Procedures Handbook § 1.2(A) (emphasis added). Indeed, "clear and conspicuous language disclaiming any contractual liability" in an employee handbook precludes "the existence of an implied-in-fact contract." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991). Plaintiff attempts to combat this contractual disclaimer in several ways.

First, Plaintiff contends the disclaimer cannot apply to the Workplace Violence Policy. In support she cites *Cabaness v. Thomas*, 232 P.3d 486 (Utah 2010), a case where the Utah Supreme Court allowed a former employee of a city company to bring a breach of contract claim against the company for failing to abide by its workplace policies prohibiting harassment. *Id.* at 492, 502. The specific policies stated that the city "will not tolerate verbal or physical conduct by any employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment" and that "[o]ral or written threats, physical assault, harassment, intentional damage, and every other act or

35

threat of violence by City employees is strictly prohibited." *Id.* at 492 (alteration in original) (internal quotation marks omitted). The company, however, relied on a contractual disclaimer in its employee manual in an attempt to argue that it could not have created an implied contract with the employee. This disclaimer mandated that "[n]o contract exists between Bountiful City and its employees *with respect to salary, salary ranges, movement within salary ranges, or employee benefits*." *Id.* (alteration in original) (emphasis added) (internal quotation marks omitted).

The Utah Supreme Court held that the disclaimer mandated a finding of an implied-in-fact contract between the employee and the company. *Id.* at 503. Although the court reaffirmed the general rule that "a clear and conspicuous disclaimer . . . prevents employee manuals or other like material from being considered as implied-in-fact contract terms," the court also noted that "the disclaimer in this case does not contain broad and conspicuous language disclaiming any and all contractual liability." *Id.* Instead, the disclaimer by its terms only referred to salaries and benefits. The court held that this limited disclaimer, when combined with the harassment provisions of the employee manual, evinced the company's "intent to voluntarily undertake additional duties to protect its employees from misconduct by supervisors or other employees" and therefore be bound by the terms of an implied-in-fact contract. *Id.* at 504.

Plaintiff analogizes her case to *Cabaness* because the harassment provisions in that case are nearly identical to West Valley City's Workplace Violence Policy. In her view, this similarity alone mandates that a jury should decide whether an implied-

36

in-fact contract existed between her and West Valley City. But the main crux of the *Cabaness* decision rested on the *limited* disclaimer in the company's employee manual. *See id.* West Valley City's disclaimer is much broader: it extends to *all* "policies and procedures stated in this handbook and in other personnel statements or materials issued by the City" and thus disclaims as much contractual liability as it possibly can. And in the absence of a more limited disclaimer, the similarities between the workplace violence provisions of the two cities mean little. Consequently, *Cabaness* precludes us from finding the existence of an implied-in-fact contract between Plaintiff and West Valley City based on the City's Workplace Violence Policy. *See id.* at 504 n.9 ("If anything, our decision today may cause employers wishing to avoid contractual liability to draft their employee manuals with clear and conspicuous disclaimer language.").

But Plaintiff also claims that even if the disclaimer is applicable to the Workplace Violence Policy, it does not apply to any unwritten policies, such as the unwritten anti-retaliation policy. Not so. She bases the existence of such a policy on statements from Mr. Davis, Ms. George, and Mr. Isaac that stress the strong emphasis West Valley City placed on anti-retaliation policies and training, but the disclaimer specifically states that "policies and procedures stated . . . *in other personnel statements*" cannot constitute a contract. Further, Plaintiff signed an Employee Acknowledgement form in 2002 confirming that she received a copy of the Handbook, and this form reflects the contractual disclaimer in the Handbook. Upon signing this document, Plaintiff confirmed her understanding that "no verbal or

37

written agreements, understandings, representations, or statements made by my department head or supervisor may amend the policies outline[d] in this manual or bind the City to any course of action." Employee Acknowledgement Form 1. Thus, to whatever extent West Valley City officials stressed to employees the City's strong policy against retaliation, these statements could not bind the City via an implied-in-fact contract.

Not to be deterred, Plaintiff next contends the disclaimer cannot apply to the Workplace Violence Policy or the unwritten anti-retaliation policy for another reason: she argues the disclaimer was not "conspicuous" in November 2011 when she complained about Mr. Davis and was terminated. In support of this claim, she points out that "[t]he City has not provided a disclaimer from prior to September 2010, and there is no evidence [Plaintiff] acknowledged the 2010 disclaimer, or even saw the document prior to her 2014 deposition." Appellant's Br. 60. She therefore suggests that West Valley City first added the disclaimer in September 2010 and concludes the disclaimer could not be "conspicuous" a year later "if the City did nothing to make its employees aware" of this addition. *Id.*

This argument is tenuous at best. Mr. Isaac, West Valley City's Human Resources Director, affirmed under oath that the disclaimer had been in the Handbook since at least 1994. Further, Plaintiff affirmed in the Employee Acknowledgment form she signed that "it is [her] responsibility to keep informed" of any changes that had happened to the Handbook. Employee Acknowledgement Form 1. Thus, even in the unlikely scenario that the disclaimer was not put in the

38

Handbook until September 2010, it was Plaintiff's duty to be aware of it, and it would have been in the Handbook for at least a year before she was terminated. Plaintiff's belief that the disclaimer was not in the Handbook when she first received it in 2002 therefore cannot defeat summary judgment.

Finally, Plaintiff argues that even if the disclaimer had always been in the Handbook and applies to both the Workplace Violence Policy and the unwritten anti-retaliation policy, "it conflicts with the Employee Acknowledgment [she] signed in 2002." Appellant's Br. 61. This supposed "conflict" stems from her perception that the Employee Acknowledgement form indicates West Valley City was contractually bound by the policies in the Handbook. Specifically, she claims that since the Employee Acknowledgment form manifested her own agreement to adhere to the Handbook policies, it was reasonable for her to believe West Valley City must also adhere to the policies. She contends this "conflict" alone mandates that her contract claims should go before a fact-finder because it creates an ambiguity about whether West Valley City intended to be bound by the Handbook policies.

This argument is equally meritless. "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Daines v. Vincent*, 190 P.3d 1269, 1275 (Utah 2008) (internal quotation marks omitted). Given this definition, Plaintiff's argument is circular from a purely logical perspective: she is trying to prove the existence of a contract by establishing ambiguities between two documents, but a contract must *already* exist before giving rise to any ambiguities.

39

*See id.* And even if we disregard this logical fallacy, her belief that the Employee Acknowledgement form indicated West Valley City's intent to be contractually bound is not reasonable and thus does not give rise to any ambiguity. Surrounding circumstances cannot create an ambiguity "where the language . . . would not otherwise permit." *Id.* at 1276. Here, the language of the Handbook unequivocally disclaims any contractual obligations on West Valley City's behalf, so Plaintiff's belief otherwise is groundless. Plaintiff cannot create an ambiguity simply because the Employee Acknowledgement form made her subjectively *believe* that West Valley City was bound.

In conclusion, the contractual disclaimer in the Handbook precludes as a matter of law any existence of an implied-in-fact contract between Plaintiff and West Valley City. None of Plaintiff's arguments to the contrary can alter this outcome. And because no contract exists, West Valley City could not breach the covenant of good faith and fair dealing. *See Andreini v. Hultgren*, 860 P.2d 916, 921 (Utah 1993) ("[T]o find a breach of the duty of good faith and fair dealing, there must be some type of preexisting contractual relationship."). We affirm the district court's grant of summary judgment to Defendants on Plaintiff's contract claims under Utah law.

## VI.    42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION

Finally, Plaintiff brings another claim under 42 U.S.C. § 1983 against both West Valley City and Mr. Davis based on her belief that Defendants terminated her in retaliation for engaging in her protected First Amendment right of free speech. Plaintiff still maintains that she did not make any statements to the press about the

40

cat or planned mass-execution at the Animal Shelter, but she asks us to hold that Defendants violated her First Amendment rights since Defendants allegedly terminated her based on their *belief* that she made these statements.

This Court's traditional analysis teaches that Plaintiff can succeed on her First Amendment retaliation claim only if she can establish that "(1) she was engaged in constitutionally protected activity, (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity, and (3) the defendant's actions were substantially motivated as a response to [her] protected conduct." *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (alterations in original) (internal quotation marks omitted). In essence, Plaintiff asks us to expand the first element. She argues she should be able to prevail on a First Amendment retaliation claim if she can establish she was engaged in a constitutionally protected activity *or* the defendant *believed* she was engaged in a constitutionally protected activity.

The Supreme Court recently decided this very issue as it arises in the public employment context in *Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016). In that case, "a government official demoted an employee because the official believed, but *incorrectly* believed, that the employee had supported a particular candidate for mayor." *Id.* at 1416. The Court set out to determine whether this demotion violated the employee's First Amendment rights "[e]ven though the employee had not in fact engaged in protected political activity." *Id.* The Court held that it did:

> We conclude that . . . the government's reason for demoting [the

41

employee] is what counts here. When an employer demotes an employee out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. § 1983—*even if, as here, the employer makes a factual mistake about the employee's behavior.*

*Id.* at 1418 (emphasis added); *see also id.* at 1419 (holding that this same rule applies when an employer discharges an employee).

The question naturally arises how far the Supreme Court's decision in *Heffernan* extends: does its holding apply to *all* First Amendment retaliation claims, or is it limited only to situations where an employer demotes or discharges an employee? But that question can be answered another day. Here, *Heffernan* clearly governs Plaintiff's First Amendment retaliation claim, for Plaintiff was a public employee who claims her municipal employer discharged her based on its belief that she engaged in constitutionally protected activity. And undoubtedly, whether West Valley City officials actually believed Plaintiff leaked statements to the press is not at issue—both Mr. Davis and Mr. Morris admitted they held such a belief. Thus, as long as West Valley City officials fired Plaintiff based on this belief, then Plaintiff's denial that she was the source of these leaks is not fatal to her claim.

The district court, however, did not determine whether Plaintiff raised a genuine issue of material fact that this belief substantially motivated West Valley City officials' decision to terminate Plaintiff. Nor did it determine whether the leaks to the press qualified as "constitutionally protected activity." Instead, it granted summary judgment to Defendants solely because it determined that Plaintiff had not

42

engaged in any speech whatsoever. We also note that the parties have not otherwise briefed the applicability of these remaining elements—in both the district court and on appeal they disputed only whether Plaintiff's denial of speaking defeated her claim. Thus, we reverse the judgment of the district court on Plaintiff's First Amendment retaliation claim and remand for the court to decide whether Plaintiff can automatically proceed to trial on this claim or whether the parties must have an opportunity to dispute the remaining elements of this claim at the summary judgment stage. The district court is in the best position to make that decision in the first instance, so a remand is appropriate.

## CONCLUSION

Mr. Davis is clearly not the perfect supervisor. He not only lacked a sense of professionalism while working at the Animal Shelter but may have subjected his employees to humiliating verbal abuse. But aside from Plaintiff's allegation that she was retaliated against in violation of her First Amendment free speech rights, we cannot give her any relief against Mr. Davis or West Valley City based on the specific legal claims she brings. She was not fired because of her gender, any hostile work environment she experienced at the hands of Mr. Davis was not based on gender, and West Valley City did not form any contract with her that mandated it would protect her from workplace violence or prevent her from being retaliated against. For these reasons, most of Plaintiff's claims must fail at the summary judgment stage.

The judgment of the district court regarding Plaintiff's Title VII claims,

43

§ 1983 Equal Protection claim, and contract claims is therefore AFFIRMED. The judgment of the district court regarding Plaintiff's § 1983 First Amendment retaliation claim is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.